No. 96-704

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


RAYMOND and M. A. ALBRIGHT, et al.,

Plaintiffs, Respondents,
and Cross-Appellants,

v.

STATE OF MONTANA, by and through the
STATE OF MONTANA, and the MONTANA
DEPARTMENT OF REVENUE, et al.,

Respondents and Appellants.


APPEAL FROM:   District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Marge Johnson, Judge presiding.


COUNSEL OF RECORD:

For Appellants:

David W. Woodgerd (argued), R. Bruce McGinnis,
Deborah Harten, Brendan R. Beatty, Patrick N.
Dringman, Tax Counselors; Special Assistant
Attorneys General; Montana Department of
Revenue; Helena, Montana

For Respondents:

Larry G. Schuster (argued), and Jerry W. Schuster;
Attorneys at Law; Great Falls, Montana

For Amici Curiae:

David J. Patterson; University of Montana;
School of Law; Missoula, Montana
(Montana Association of Counties)

J. Cort Harrington, Jr.; Attorney at Law;
Helena, Montana
(Montana County Treasurers Association)


Allen B. Chronister; Chronister,
Moreen & Larson; Helena, Montana
(Montana Education Association)

David L. Nielsen; Helena City Attorney;
Helena,   Montana
(Montana League of Cities and Towns)

Janice Frankino Doggett and Lance Melton;
Helena, Montana
(Montana School Boards Association)

Geralyn Driscoll; Montana Office of Public
Instruction; Helena, Montana
(Montana Superintendent of Public Instruction)

Submitted: February 18, 1997

Decided: February 27, 1997
Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

On December 30, 1993, a group of Montana taxpayers commenced a class action suit in the District Court for the Eighth Judicial District in Cascade County to challenge the constitutionality of the statewide reappraisal of all residential and commercial property conducted by the Montana Department of Revenue (Department) pursuant to  15-7-111, MCA.  The taxpayers filed

fifteen motions for partial summary judgment, and the Department responded with fifteen cross-motions for summary judgment. On December 5, 1996, following oral argument, the District Court entered an order in which it (1) granted one of the taxpayers' motions for partial summary judgment and held that by utilizing more than one method of appraisal for both residential and commercial property, the Department had failed to equalize the values of the taxpayers' properties as required by both Article VIII, Section 3, of the Montana Constitution, and 15-7-112, MCA, and (2) granted another of the taxpayers' motions for partial summary judgment and held that the Department had failed to assess taxable property in four Counties before the second Monday in July 1993, as required by 15-8-201, MCA. The District Court stayed enforcement of its decision pending an appeal of its order to this Court. The Department appeals the District Court's order which granted two of the taxpayers' motions for summary judgment. The taxpayers cross-appeal on three grounds. We reverse the order of the District Court which granted summary judgment in favor of the taxpayers and remand to that court for entry of judgment consistent with this opinion. Based on our conclusions, we do not reach the issues raised on cross-appeal.

We address two issues on appeal:

1. Did the District Court err when it granted summary judgment to the taxpayers based on its determination that the Department's appraisal and valuation processes violate 15-7-112, MCA, and Article VIII, Section 3, of the Montana Constitution?

2. Did the District Court err when it concluded that tax assessments were invalid for those taxpayers whose assessment notices were not sent before the second Monday in July 1993?

FACTUAL BACKGROUND

Pursuant to 15-7-111, MCA, the Montana Department of Revenue is charged with the administration and supervision of a program for the revaluation of all taxable property within the state for ad valorem tax purposes. The Department began the revaluation or reappraisal of property, which is the subject of this appeal, in 1987 and completed the process on or before December 31, 1992. As part of its system of revaluation, the Department adopted a comprehensive appraisal plan, as required by 15-7-111, MCA. That plan is set forth in Rules 42.18.101 through 42.18.126, ARM. The Department's original appraisal plan provided that, for the first time, a Computer Assisted Mass Appraisal System (CAMAS) would be implemented to assist the Department's appraisers in the valuation process.

According to the Department's appraisal manuals, adopted pursuant to Rule 42.18.123, ARM, the CAMAS system is "designed to help the Appraiser create and maintain records and procedures needed to arrive at a just, equitable, and defensible valuation for each parcel of real estate within [each] county" in the state.

CAMAS uses its files of property assessment data to produce computer-assisted valuations for residential, agricultural, commercial, and industrial properties.

According to a Department of Revenue public document entitled, "What is CAMAS?" CAMAS uses three approaches to valuing property: (1) the cost approach, (2) the market data approach, and (3) the income approach. The cost approach involves estimating the depreciated cost of reproducing or replacing the building and site improvements. Depreciation is deducted from this cost for loss in value caused by physical deterioration and functional or economic obsolescence. To this depreciated cost is added the estimated value of the land. The widest application of the cost approach is in the appraisal of properties where the lack of adequate market and income data preclude the reasonable application of other traditional approaches.

The market data approach involves the compilation of sales and offerings of properties which are comparable to the property being appraised. The sales and offerings are then adjusted for any dissimilarities and a value range obtained by comparison of those properties. According to the Department's document "[t]he significance of this approach lies in the ability to produce estimates of value which directly reflect the attitude of the market. Its application is contingent upon the availability of comparable sales, and therefore finds its widest range in the appraisal of vacant land and residential properties."

The income approach measures the present worth of the future benefits of the property by the capitalization of the net income stream over the remaining economic life of the property. This approach involves making an estimate of the "effective gross income" of a property, derived by deducting the appropriate vacancy and collection losses from its estimated economic rent, as evidenced by the yield of comparable properties. From this figure, applicable operating expenses, including insurance and reserve allowances for replacements, are deducted, resulting in an estimate of net income which may then be capitalized into an indication of value.

CAMAS's three approaches to the valuation of property are consistent with the Department's appraisal plan, as set forth at Rules 42.18.101 through 42.18.126, ARM. According to the Department's appraisal plan, residential property is to be appraised using the market data approach or the cost approach. Rule 42.18.108(9), ARM. Commercial property is to be appraised using the cost approach, the income approach, or, when possible, the market data approach. Rule 42.18.111(9), ARM. Industrial property is to be appraised using only the cost approach. Rule 42.22.1304, ARM. The CAMAS system functions in accordance with the Department's appraisal plan by producing computer-assisted cost and market estimates of residential properties, cost and income

estimates for commercial properties, and cost estimates for industrial properties.

For the valuation of residential property, CAMAS produces both a market value estimate and a cost estimate. CAMAS's market value estimate is produced by averaging seven values. Five of the values are comparable sales, which are determined by Realty Transfer Certificates. The remaining two values are computer-driven values from internal regression mathematics in CAMAS. The final market value estimate is the result of arraying the seven numbers from high value to low value. The two highest figures and the two lowest figures are struck, and the middle three figures are averaged to produce the market value estimate. A "Comparable Sales Sheet" is generated when a residential parcel has been subject to the market modeling tax appraisal process. When there are not a sufficient number of comparable sales to create a market value estimate, residential property is appraised solely by the cost approach. CAMAS's cost estimate is produced by estimating the cost of replacing or reproducing the residential structure, deducting a depreciation value from this cost and adding the underlying land value, as determined by Computer Assisted Land Pricing (CALP) models. For those properties where there is sufficient data available for both a market value estimate and a cost estimate, CAMAS will produce both figures. Because it is unusual for both figures to be identical, the appraiser reconciles the differences by choosing the most accurate approach to value after a consideration of the relevance of each approach to the subject property, the amount and reliability of data collected in each approach, and the inherent strengths and weaknesses inherent in each approach. The appraisers choice of valuation approach and the estimated appraisal of the property based on that approach are set forth in a "Property Record Card," which is available to the property owner for review.

For the valuation of commercial property, CAMAS produces a cost estimate and, in some instances, an income estimate. The income approach to valuation is the preferred method of valuation of commercial properties in Montana. The Department's process for income valuation of commercial property begins with the submission of income and expense questionnaires to commercial property owners to complete and return. The information on the statements is reviewed by an appraiser and entered into the CAMAS system. Once in the computer, it can be sorted and analyzed using selectability criteria. The information is then correlated and commercial income models are developed. Such models may only be created, however, in areas where sufficient income and expense data has been collected. Because commercial property owners are not required to provide such information to the Department, the income approach to commercial property valuation in Montana is limited to those six counties in Montana in which ample data exists. In all other counties in

Montana, commercial property is valued using the cost approach to valuation. Although the Department's appraisal plan provides that commercial property may also be estimated by the market data approach, the Department has not developed any market models for commercial property in Montana. Therefore, the CAMAS system estimates commercial property values based on either the income approach in six Montana counties or the cost approach in the remaining counties. The evaluation approach for commercial property and its estimated market value, as established by that method, are set forth on a "Property Record Card," which is available for review by the commercial property owner.

For both residential and commercial property for which the cost approach to property valuation is applied, the Department adjusts property values based on an "Economic Condition Factor." An "Economic Condition Factor" (ECF) is defined by the Department's CAMAS users' manual as "extraordinary economic obsolescence that impacts all property located in a specific neighborhood, community, or geographic area." According to the CAMAS manual, "[t]he Economic Condition Factor attempts to correct for the difference between replacement cost less normal depreciation and market value as they may differ from locality to locality."

The purpose of the ECF is to adjust the cost approach to valuation to take local market influences, such as a depressed or very active market area, into account. For example, if a new residence is constructed in an economically depressed area, the cost of the new construction may well exceed the selling price of the residence. According to the Department, to value this new residence with a strict unadjusted cost approach would create a significant disparity from appraisals based solely on the market data approach and frustrate the goal of equalization.

The Department of Revenue applies ECFs to adjust both residential and commercial property valuation where the cost approach is used. An ECF is calculated for residential property by comparing an estimation of values using the market approach to an estimation of values using the cost approach. The ratio determined by dividing the average market value by the average cost value is the ECF. An ECF is calculated for commercial property by comparing an estimation of the average sales price to an estimation of the average cost value. The ratio determined by dividing the average sales price by the average cost value is the ECF. ECFs apply only to the depreciated reproduction or replacement cost of the improvements to the land, and not to the value of the land itself. ECFs are not used for those residential properties whose value is determined by the market value approach or for those commercial properties whose value is determined by the income approach. In addition, ECFs are never applied to industrial property valuation.

For the valuation of industrial properties in Montana, CAMAS uniformly uses the cost approach to valuation. CAMAS applies the

cost approach by determining the value of the underlying land, according to a CALP estimation, and adding to that value the cost of replacement of the industrial building and improvements minus the depreciation, as determined by use of depreciation schedules taken from the Marshall and Swift Valuation Service. The final estimated market value, as determined by the cost approach to valuation, is set forth in the property record card.

The culmination of the tax appraisal process is the preparation of the "Property Record Card." That card reflects the Department of Revenue's final tax appraisal activity for each parcel of taxable property. The record card can be reviewed in the paper format, or it can be reviewed through the CAMAS computer program. Each property record card has a section entitled "Appraisal Inspection Information." This section displays the times that the Department's appraisers were physically present at the subject property, the types of inspections, and the I.D. number of the Department's employee who was at the premises. In addition, each property record card has a section entitled "Summary of Values." This section sets forth the final appraised land value, the final appraised buildings value, the final adjusted appraised market value for the property, and the appraisal approach used in arriving at the final property valuation. If the cost approach to property value was used to determine the final market value for the property, the details of that approach, as well as the applicable ECF, are detailed on the reverse side of the card. If the market value approach was used, a separate "Comparable Sales Sheet" is generated.

The Department of Revenue completed its reappraisal of property which is the subject of this appeal on or before December 31, 1992. Following the revaluation, the Department mailed to each of the plaintiff taxpayers a notice of classification and appraisal, pursuant to 15-7-102, MCA, and an assessment notice pertaining to the assessment required by 15-8-201, MCA. In Madison County, the final mailing of classification and appraisal notices was completed on July 12, 1993. In Beaverhead County, the final mailing was completed on July 13, 1993. In Gallatin County the final mailing date was July 15, 1993. In Park County the final mailing date was July 19, 1993. In all other counties, classification and appraisal notices were mailed prior to July 12, 1993.

On December 30, 1993, a group of taxpayers filed a complaint in the Eighth Judicial District Court in which they alleged, inter alia, that (1) the Department had failed to equalize the values of the plaintiffs' properties according to Article VIII, Section 3, of the Montana Constitution, which provides that the State must appraise, assess, and equalize the valuation of the plaintiffs' properties in the manner provided by law; (2) the Department had failed to equalize the values of the plaintiffs' properties and

taxable property in Montana according to 15-7-112, MCA; and (3) the Department had failed to fulfill the duties and obligations set forth at 15-8-201, MCA, which provides that the Department is required to assess the plaintiffs' properties before the second Monday in July 1993. On December 5, 1996, the District Court entered an order in which it granted the plaintiff taxpayers' motion for summary judgment and held that the Department of Revenue, by utilizing more than one "method" of appraisal for both residential and commercial property, had failed to equalize the values of the taxpayers' properties as required by both Article VIII, Section 3, of the Montana Constitution, and 15-7-112, MCA. Although the court noted that the Department had "attempted to apply the best market estimate appraisal method whenever possible," the court held that the application of three approaches to property valuation was contrary to the constitutional goal of equalization. In addition, the District Court held that the Department had failed to assess all taxable property before the second Monday in July, as required by 15-8-201, MCA, and that that section "imposes a mandatory duty to send out the tax assessment notices to taxpayers before the second Monday in July." The court therefore held that tax assessments mailed out after July 12, 1993, in Gallatin County, Park County, Beaverhead County, and Madison County were invalid pursuant to 15-8-201, MCA, and that any tax increase based on those assessments was unenforceable.

ISSUE 1

Did the District Court err when it granted summary judgment to the taxpayers based on its determination that the Department's appraisal and valuation processes violate 15-7-112, MCA, and Article VIII, Section 3, of the Montana Constitution?

A. STANDARD OF REVIEW

Summary judgment is governed by Rule 56(c), M.R.Civ.P., which provides, in relevant part, as follows:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

In this case, the taxpayers and the Department moved for summary judgment on the salient issues. Both parties agree that there are no genuine issues of material fact. Therefore, we review only the District Court's conclusions of law. When we review a district court's conclusions of law, the standard of review is whether those conclusions are correct. Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

B. SECTION 15-7-112, MCA

Section 15-7-112, MCA, provides as follows:

Equalization of valuations. The same method of appraisal and assessment shall be used in each county of the state to the end that comparable property with similar true market values and subject to taxation in Montana shall have substantially equal taxable values at the end of each cyclical revaluation program hereinbefore provided.

The District Court concluded that the Department's market-based method--which utilizes, depending on the available market data, the market data approach, the income approach, the cost approach, or some combination of these approaches--violates 15-7-112, MCA. In essence, the District Court concluded that 15-7-112, MCA, requires the Department to utilize only one "method" when it estimates statewide market values, and that the Department's use of three different approaches, particularly the market data approach, violates that requirement. Ultimately, the District Court determined that in order to comply with 15-7-112, MCA, the Department is required to appraise and assess all property by utilizing only one approach, specifically, the cost approach, to estimating market value.

On appeal, the Department contends that 15-7-112, MCA, does not mandate the utilization of only one approach to estimating market values statewide, and that its current method is, in fact, the most effective way to approximate market values, given the market data that is available. The Department, therefore, claims that the District Court erred when it concluded that the utilization of a market-based method, which utilizes and combines three different approaches to estimating market value, violates 15-7-112, MCA. In support of this claim, the Department asserts that when 15-7-112, MCA, is analyzed in light of other statutory mandates placed upon the Department, it is clear that 15-7-112, MCA, permits utilization of the market data approach, that this approach, by necessity, will vary from place to place depending on available data, and therefore, that the District Court's interpretation of 15-7-112, MCA, is incorrect. The Department further asserts that, accordingly, the District Court's narrow interpretation of the term "method," as it is used in 15-7-112, MCA, is also incorrect.

## 1. STATUTORY SCHEME

When we interpret a statute, our function is to effectuate the intent of the Legislature. Pretty on Top v. Snively (1994), 266 Mont. 45, 47, 879 P.2d 49, 50. Furthermore, we have previously concluded that when we construe a statute, "the whole act must be read together and where there are several provisions or particulars, a construction is, if possible, to be adopted that will give effect to it all." Larson v. Crissmore (1987), 228 Mont. 9, 15, 741 P.2d 401, 405. Finally, it is well established that "this Court presumes that the legislature would not pass

meaningless legislation, and the Court must harmonize statutes relating to the same subject, giving effect to each." Montana Contractors' Ass'n v. Department of Hwys. (1986), 220 Mont. 392, 395, 715 P.2d 1056, 1058. We will, therefore, analyze 15-7-112, MCA, based on these rules of statutory construction.

Section 15-8-111, MCA, requires that "[a]ll taxable property must be assessed at 100% of its market value except as otherwise provided." This section provides the following definition of market value:

Market value is the value at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

Section 15-8-111(2)(a), MCA (emphasis added). We conclude that when the Legislature defined "market value" as the price at which property would change hands in an arms-length sale, it evidenced its intent that the market data approach to value--and not just the cost approach--can and should be utilized by the Department when it appraises and assesses property.

Our conclusion is further supported by our prior decision in DeVoe v. Department of Revenue (1993), 263 Mont. 100, 866 P.2d 228. In that case, we interpreted 15-8-111, MCA, and stated:

It is true that the very next paragraph found at 15-8-111(2)(b), MCA, states that the DOR may use "construction costs as one approximation of market value." However, we hold that evidence of construction costs alone, without consideration of any market factors, does not satisfy the requirement of 15-8-111(1), MCA, that the assessed value equal market value. . . .

Market value depends on the price that a willing buyer would pay a willing seller, taking into consideration relevant facts. Presumably, relevant facts would include the market and economic conditions prevailing at the time of sale.

DeVoe, 263 Mont. at 112, 866 P.2d at 235-36.

Furthermore, 15-8-111, MCA, also states:

If the department uses construction cost as one approximation of market value, the department shall fully consider reduction in value caused by depreciation, whether through physical depreciation, functional obsolescence, or economic obsolescence.

Section 15-8-111(2)(b) (emphasis added). We conclude that the language of 15-8-111(2)(b), MCA, provides strong evidence that

the Legislature did not intend for only one approach to value to be utilized when property is appraised and assessed. In fact, if the Legislature did intend for only one approach to be utilized, then 15-8-111(2)(b), MCA, would be superfluous.

Sections 15-7-301 through -311, MCA, are entitled the Realty Transfer Act. This Act requires the parties to a real estate transfer to submit to the Department a realty transfer certificate which states the price of the subject property. The Department then considers the information when it appraises property by the market data approach to estimating market value. Pursuant to 15-7-302, MCA, the express purpose of this Act is "to obtain sales price data necessary to the determination of statewide levels and uniformity of real estate assessments by the most efficient, economical, and reliable method." Section 15-7-302, MCA. We conclude that when the Legislature enacted this Act, it clearly intended to allow the Department to utilize the market data approach when it estimates market value.

Finally, 15-7-401 through -403, MCA are entitled the Appraisal of Residential Property in Areas of Changing Use. This part provides that if residential property is located in an area of commercial or industrial growth, the property owner can elect to have the property assessed at its value as residential property, rather than at its value as commercial property. It is designed to protect homeowners from paying higher taxes when their property could be sold for a higher price as commercial property than as residential property. We conclude that if the Legislature intended, as the District Court determined, that all property must be assessed solely by one approach--the cost approach--to estimating market value, then the protection provided by 15-7-401 through -403, MCA, would be wholly unnecessary.

When the above-referenced statutes are read as a whole and the pertinent principles of statutory construction are applied, it is clear that the Legislature intended the Department to utilize both the cost approach and the market data approach, depending upon the available market data, when it assesses property and estimates market value. The next question is whether utilization of various approaches is contrary to the statutory mandate that appraisals be done by the same "method" statewide.

2. DEFINITION OF "METHOD," AS USED IN 15-7-112, MCA

As previously noted, the District Court concluded that 15-7-112, MCA, permits the Department to utilize one, and only one, approach when it appraises property and estimates market value. The District Court based its conclusion on the language of 15-7-112, MCA, which provides, in part, that "[t]he same method of appraisal and assessment shall be used."

The key term in the statute is "method." Apparently, the District Court concluded that the term "method" is the equivalent of the term "approach," and that, therefore, "method" could only

entail either the market data approach, the income approach, or the cost approach, but certainly not all three.

We conclude, however, based on the facts set forth previously, that the term "method," as it is used in 15-7-112, MCA, does not refer to any single approach; rather, the term "method" refers to a consistent process for arriving at market value, the details of which may vary from place to place, depending on available data, and which will necessarily include a number of different approaches--e.g., the market data approach, the income approach, the cost approach--or some combination of these approaches, depending on the market in the area where appraisals occur. Accordingly, we hold that the District Court also erred when it interpreted the term "method," as it is used in 15-7-112, MCA, to include only one approach.

C.   ARTICLE VIII, SECTION 3, OF THE MONTANA CONSTITUTION

Having already held that the Department's market-based method of assessing property and estimating market values does not violate 15-7-112, MCA, we now must address the important question of whether such a market-based method is constitutionally permissible.

The relevant provision of the Montana Constitution is Article VIII, Section 3, which provides as follows: "Property tax administration.  The state shall appraise, assess, and equalize the valuation of all property which is to be taxed in the manner provided by law."  Mont. Const. art. VIII,  3.

The District Court concluded that equalization, as mandated by Article VIII, Section 3, of the Montana Constitution, can be achieved only if a single approach to value is utilized for every parcel of class four property within the state.  On that basis, the District Court found, as it did with regard to 15-7-112, MCA, that the Department's market-based method--which necessarily includes several approaches--violates Article VIII, Section 3, of the Montana Constitution.

On appeal, the Department contends that the District Court erred when it concluded that the utilization of a market-based method to appraise property and estimate market values violates Article VIII, Section 3, of the Montana Constitution. Specifically, it asserts that a review of the 1972 Montana Constitutional Convention's transcript reveals that, with regard to Article VIII, Section 3, three "themes" prevailed: (1) the delegates intended the provision to secure equalization between the various counties; (2) the delegates intended the provision to be flexible, so that future legislators would be able to define the precise means of taxation; and (3) the delegates anticipated the utilization of more than one approach to value as a legitimate method of determining market values.  In essence, it claims that Article VIII, Section 3, contemplates a market-based method which utilizes multiple approaches to estimating market values and that, concomitantly, such a market-based method is constitutionally

permissible.

It is well established that the intent of the framers of a constitutional provision must be given effect when the provision's meaning is at issue. State ex rel. Nelson v. Ninth Dist. Court (1993), 262 Mont. 70, 79, 863 P.2d 1027, 1032 (citing Keller v. Smith (1976), 170 Mont. 399, 405, 553 P.2d 1002, 1006). Furthermore, we have previously held that when we construe a constitutional provision, we are obligated to "employ the same rules of construction employed to construe statutes." State v. Cardwell (1980), 187 Mont. 370, 373, 609 P.2d 1230, 1232. It also follows then, as with the construction of statutes, that we are occasionally called upon to consider the enacting history of a provision. Department of Revenue v. Puget Sound Power & Light Co. (1978), 179 Mont. 255, 263, 587 P.2d 1282, 1287; Guillot v. State Highway Comm'n (1936), 102 Mont. 149, 155, 56 P.2d 1072, 1074.

Pursuant to Montana's 1889 Constitution, assessments were conducted independently within each county by the County Board of Equalization. See Mont. Const. art. XII, 15 (1889). The County Board of Equalization consisted of county commissioners from that county. All of the county boards were overseen by the State Board of Equalization, which reviewed and "equalized" the valuations of taxable properties between the counties in order to "secure a fair, just and equitable valuation of all taxable property among counties, between the different classes of property, and between individual taxpayers." Mont. Const. art. XII, 15 (1889).

At the 1972 Montana Constitutional Convention, the proposed adoption of Article VIII, Section 3, generated a substantial amount of debate. Ultimately, the delegates elected to adopt Article VIII, Section 3, and as a result, drastically changed the administration of property taxation within the State of Montana. One of the primary proponents of Article VIII, Section 3, Delegate Rygg, commenced the debate with the following observations:

[Article VIII, Section 3,] would open the door to a whole new concept of taxation . . . . However, it still would be the Legislature's prerogative to decide how far-reaching it wants the effects of the change to be . . . . It is a duty of the Legislative branch to define the tax administration system and the duty of the Executive branch to administer that system. Let us consider, for a moment, our present system of taxation. Currently each county has its own administrating personnel. Now, if there were no need for statewide taxes and if our educational system was not funded at all by property tax, this method would be adequate. However, because much of the education equality is based on property tax, it is necessary that we change from an individual county system to a statewide system.

Verbatim Transcripts, 1971-72 Montana Constitutional Convention, Vol. V, pp. 1379-80 (March 3, 1972).

Another proponent of Article VIII, Section 3, Delegate McDonough, expressed the following similar observations:

All it [Article VIII, Section 3,] does is give the ultimate authority to appraise and equalize taxes in the state . . . . Reclassification come [sic] into effect 14 or 15 years ago, and there still is not equalization between counties.  That is all we want to do by this section--is to give the Legislature the power to equalize the property tax in Montana . . . . They [the Legislature] can do what they want, and that's what we want to do by the--removing these restrictions on the valuation of the property tax . . . . And that's why we're here.  We're allowing the Legislature to be able to make a statewide valuation of property.  They're the ones . . . that have to pay the bill.  They are the ones that have to levy the taxes.  Therefore, they're the ones that have that responsibility, and they should also have the responsibility of setting this thing up so it will work.

Montana Constitutional Convention Transcript at 1386-87.

A review of the transcript reveals that the observations of Delegates Rygg and McDonough are accurate representations of the framers' views.  On that basis, we conclude that the framers intended Article VIII, Section 3, to (1) equalize assessment among the counties, and (2) provide the Legislature with the necessary flexibility to achieve equalization in the most efficient and equitable manner.  The fact that the framers intended to provide the Legislature with substantial flexibility is further evidenced by the express language in Article VIII, Section 3, which states, "in the manner provided by law."

Furthermore, additional comments in the transcript provide strong evidence that the framers anticipated and intended that various approaches to estimating market value, and not just a single approach, could be utilized in order to achieve "equalization."  For example, Delegate Lorello asked Delegate McDonough the following hypothetical question:

Let's get to the word "equalize."  And let's suppose that today we build a home in Billings costing $25,000.  Let's then build another home in Philipsburg, Montana, and it too will cost $25,000.  Now then, would you tell me what the taxes would be on these two homes?  Just what would they be at the end of the year?  How would you equalize these things, between the two cities?

Delegate McDonough provided the following response:
What we do by this proposal, we don't tell anybody how

they're going to equalize these two taxes between these two counties; we leave that to the Legislature. And one thing I'd like to make clear on that here--that we don't say anything has to be equalized in any one manner. We leave that to the Legislature and the body that they set up . . . . We don't say that land has to be taxed on market value. And incidentally, houses are--residential houses are in Montana. We don't say that other land can't be taxed on productive value . . . . And there's nothing in what we're proposing that you can't tax it on productive value. This thing about changing--how do you arrive at valuation, we're leaving that wide open, because how to arrive at valuation of any piece of property is very complex. And market value is just one of the things you take in consideration. Now, on the difference between the houses. Presently now, houses are started off with--that class of property does start off with market value. And if the house is only worth--you build a house in Philipsburg and if there's not too much market for a house and you pay $25,000 for it, it might only be worth 20. And if the Legislature says that houses will be on market value, then that house will be 20 in Philipsburg and 25 in Billings . . . . But I don't know what the Legislature is going to do. They might actually go to a rental value instead of a market value . . . . And they should be allowed that flexibility . . . .

Montana Constitutional Convention Transcript at 1391.
We conclude that the record from our Constitutional Convention clearly indicates the framers' understanding that productive value (the income approach) and the market data approach can both be utilized by the State when it attempts to "appraise, assess, and equalize the valuation of all property which is to be taxed in the manner provided by law." Therefore, we conclude that, contrary to the District Court's determination, the framers of Article VIII, Section 3, did not intend for equalization to require the exclusive utilization of a single approach to estimating market value. Rather, the framers anticipated and intended that the State could utilize a number of different approaches, including the utilization of a market-based method, to "appraise, assess, and equalize the valuation of all property."
The taxpayers argue that the ECFs, which are designed to narrow the inconsistency between the cost approach and market data approach, are no different than the "blanket multipliers," and stratified sales assessment ratio studies (ratio studies), which we condemned in Department of Revenue v. Barron (1990), 245 Mont. 100, 799 P.2d 533, and Department of Revenue v. Sheehy (1993), 262 Mont.

104, 862 P.2d 1181. We disagree. The ratio studies at issue there were the statutorily mandated method of appraisal and the issue was whether that method was constitutional. These studies produced ratios utilizing historical data (actual sales prices and existing appraised values) without any actual new appraisal. Barron, 799 P.2d at 534. We concluded that the non-uniform application of the ratios unconstitutionally required certain taxpayers to bear a disproportionate share of the tax burden. Barron, 799 P.2d at 540.

The use of ECFs is a recognized and accepted practice by fee appraisers. The ECFs used here are an integral component of CAMAS; are applied uniformly in the localized area; and appropriately take into consideration and adjust cost approach appraisals on individual parcels of property for current local economic and market conditions. Absent the integration of such economic and market influences, the results of the new appraisal produced by the cost approach would be skewed.

We therefore conclude that the Department's market-based method--which utilizes a combination of approaches--does not violate Article VIII, Section 3, of the Montana Constitution.

D. CONCLUSION

We recognize that the Department's method of assessing property and estimating market values is by no means perfect, and will occasionally miss the mark when it comes to the Constitution's goal of equalizing property valuation. However, perfection in this field is, for all practical purposes, unattainable due to the logical and historical preference for a market-based method, and the occasional lack of market data. Nonetheless, we conclude that the Department's interdisciplinary method--which utilizes the market data approach, the income approach, the cost approach, or some combination of these approaches--is a reasonable attempt to equalize appraisal of real property throughout the State and that it comports with the most modern and accurate appraisal practices available.

Finally, we note that in those occasional situations when, due to the inherent imperfections in the Department's market-based method, fair, accurate, and consistent valuations are not achieved, individual taxpayers can and should avail themselves of the property tax appeals process set forth at 15-15-101, -102, -103, and -104, MCA.

For these reasons, we hold that the District Court erred when it concluded that the Department's appraisal and valuation processes violate 15-17-112, MCA, and Article VIII, Section 3, of the Montana Constitution.

ISSUE 2

Did the District Court err when it concluded that tax assessments were invalid for those taxpayers whose assessment notices were not sent before the second Monday in July 1993?

Section 15-8-201, MCA (1993), provides in relevant part that:

(1) The Department of Revenue or its agent must, between January 1 and the second Monday of July in each year, ascertain the names of all taxable inhabitants and assess all property subject to taxation in each county . . . .

In 1993, July 12 was the second Monday of July. The record does not indicate the date when the Department completed its assessment of property subject to taxation in each county. However, the District Court did find that in Madison County notices of assessment were not sent out until July 12, 1993, and in Beaverhead, Gallatin, and Park Counties, notices were sent out between July 13 and 19, 1993. Based on these facts, and our interpretation of 15-8-201, MCA (1993), in Butte Country Club v. State (1980), 186 Mont. 424, 608 P.2d 111, the District Court held that:

The subclass of plaintiffs whose property taxes were increased pursuant to assessment notices and levies sent out after the second Monday in July, 1993, are granted summary judgment and that the assessments and levies, to the extent they increased taxes for those taxpayers, are invalid . . . .

On appeal from that holding, the Department requests that we reconsider our decision in Butte Country Club, and that even if we reaffirm that decision, we limit its effect to the facts in that case for the following reasons respectively:

1. The plain language of 15-8-201, MCA (1993), does not require that notices of assessment be sent by the second Monday of July, but only that property be assessed by that date.

2. This Court misapplied 15-8-308, MCA (1993), in Butte Country Club. That section provides that assessments are not illegal simply because not completed within the time required by law.

3. Even if Butte Country Club is affirmed, its effect should be limited to the facts in that case in which the taxpayers were actually precluded from appealing their assessments because their assessment notices were late. Based on changes in the law, that result is no longer possible.

The taxpayers simply respond that our holding in Butte Country Club was recently reaffirmed in Canbra Foods Ltd. v. Department of Revenue (Mont. 1996), 925 P.2d 955, 53 St. Rep. 954, and that our decision in Butte Country Club requires that the District Court be affirmed.

In Butte Country Club, the District Court issued writs of prohibition restraining the Department from assessing the Butte Country Club and the Grand Hotel at appraised values determined by the Department in 1978. The Country Club received its notice of change in property valuation on August 31, 1978. The owners of the

Grand Hotel also received their notice in late August 1978. Both taxpayers filed notices of appeal with the Butte-Silver Bow County Tax Appeal Board. However, those appeals were not filed in time to be heard by the local Board.

In Butte Country Club, we affirmed the district court's conclusion that untimely tax assessments were illegal and unenforceable. We held that:

The words of section 15-8-201, MCA [1977], are plain, unambiguous and certain. This statute requires the DOR to assess all property subject to taxation between January 1 and the second Monday of July. The statute contains the word "must", and this clearly indicates that the statutory commands are mandatory, and not discretionary. The DOR must assess property by the second Monday in July, and that was not complied with in the instant case.

Butte Country Club, 186 Mont. at 429, 608 P.2d at 114. We held that 15-8-308, MCA, did not save the Department's late assessments for the following reasons:

The DOR's argument that section 15-8-308, MCA, allows late assessments is without merit in the context of the instant case. Section 15-8-308, MCA, provides:

"No assessment or act relating to assessment or collection of taxes is illegal on account of informality or because the same was not completed within the time required by law."

The cases interpreting this statutory provision have made a distinction between irregularities regarding assessments which are informalities, and those which are matter of substance. See Anderson v. Mace (1935), 99 Mont. 421, 45 P.2d 771; Perham v. Putnam (1928), 82 Mont. 349, 267 P. 305; Cobban v. Hinds (1899), 23 Mont. 338, 59 P. 1. A departure from a legal requirement is not an informality, but rather is a matter of substance and is vital. Perham v. Putnam, supra, 82 Mont. at 361.

Butte Country Club, 186 Mont. at 429, 608 P.2d at 114-15. We also held that 15-8-201, MCA (1977), was a specific statute which must prevail over 15-8-308, MCA (1977), because it is a general statute. Although not specifically stated, it is obvious from the context in which we arrived at our decision in Butte Country Club, that critical to our conclusion was the fact that "[t]he DOR's late assessment effectively precluded review by the Local Board in the instant case." Butte Country Club, 186 Mont. at 432, 608 P.2d at 116.

While it was reasonable for the District Court to conclude that our decision in Butte Country Club controlled the outcome of the issue raised by late assessment notices, we conclude, for several reasons, that that case should not be followed, based on the facts in this case and subsequent developments in statutory law.

First, the plain language of 15-8-201, MCA (1993), does not require that assessment notices be sent by the second Monday in July. It requires only that property be "assessed" by that date. Black's Law Dictionary defines "assess" as "fix the value of." Black's Law Dictionary 116 (6th ed. 1990).

There is no indication from the record before us that the properties in the counties which are the subject of the District Court's decision were not assessed before the second Monday of July 1993. The only evidence was that notices of assessment were not sent out in those counties until or after that date. Furthermore, our decision in Butte Country Club refers only to property which was "assessed" after the deadline provided for in 15-8-201, MCA (1977). Although it does seem to equate assessment with the date on which notices of change in property valuations were sent, nowhere does that decision specifically hold that assessments are invalid simply because the notice of assessment is sent on or after the second Monday in July.

Second, our interpretation of 15-8-308, MCA (1977), seems to focus exclusively on the term "informality" and ignore the separate independent part of that statute which provides that no assessment is illegal "because the same was not completed within the time required by law." In doing so, we concluded that time periods which are mandated by statute are not an "informality," but ignored the inescapable conclusion that if there were not time periods required by law, there would be no need to excuse them in the second part of the statute. In the process, we ignored the most fundamental rule of statutory construction, which is that the role of a court is simply to declare what the terms of a statute are, and not to omit what the Legislature has seen fit to include. Section 1-2-101, MCA. We also ignored those rules discussed previously in this opinion to the effect that "this Court presumes that the legislature would not pass meaningless legislation, and the Court must harmonize statutes relating to the same subject, giving effect to each." Montana Contractors' Ass'n v. Department of Hwys. (1986), 220 Mont. 392, 395, 715 P.2d 1056, 1058.

Third, we concluded, without explanation, that 15-8-201, MCA, is specific, but that 15-8-308, MCA, is general, and therefore, that -201 must control if there is a conflict between the two statutes. However, there is no apparent basis for concluding that one statute is more specific than the other. Section -201 is found in that part of Title 15, Chapter 8, which pertains to "when property is assessed." Section -308 is found in

that part of Title 15, Chapter 8, which describes "how property is assessed." If it was not for the time requirements found in Part 2, there would be no logical need for the qualifications set forth in  -308.

Finally, our decision in Butte Country Club was based on the substantive effect that late assessments had on the taxpayers' ability to appeal their changed property valuations. Section 84-603, RCM (1977), which applied to the taxpayers in the Butte Country Club case, provided that:

No reduction may be made in the valuation of property unless the party affected or his agent makes and files with the county tax appeal board on or before the first Monday in June a written application therefore. The application shall state the post office address of the applicant, shall specifically describe the property involved, and shall state the facts upon which it is claimed such reduction should be made.

Because of this statute, we concluded in Butte Country Club that, "[t]he DOR's late assessment effectively precluded review by the Local Board in the instant case." Butte Country Club, 186 Mont. at 432, 608 P.2d at 116.

The successor to  84-603, RCM, which was in effect at the time notices of assessment were sent out in this case, was 15-15-102, MCA (1979), which provides as follows:

No reduction may be made in the valuation of property unless the party affected or his agent makes and files with the county tax appeal board on or before the first Monday in June or 15 days after receiving notice of classification and appraisal from the Department of Revenue, whichever is later, a written application therefore. The application shall state the post office address of the applicant, shall specifically describe the property involved, and shall state the facts upon which it is claimed such reduction should be made.

(Emphasis added.)

In other words, even if we assume that notice of assessment is the equivalent of "assessment," the effect of a late notice no longer has the substantive impact on a taxpayer that it had in the Butte Country Club case. Therefore, even if we focused, as the Court did in that case, on that part of  15-8-308, MCA, which refers to "informality," rather than the part which refers to timeliness, we could not come to the same conclusion that notices of assessment are currently substantive, as opposed to an "informality."

Neither is it correct that the rule from the Butte Country Club case was recently affirmed in Canbra Foods Ltd. v. Department

of Revenue (Mont. 1996), 925 P.2d 855, 53 St. Rep. 954.  Our decision in Canbra Foods did not deal with the effect of late "assessment" or "notice of assessment" on the legality of the assessment.  That case dealt only with the timeliness of the taxpayer's application for reduction of property valuation.  Therefore, it is irrelevant to our decision in this case.

For these reasons, we reverse that part of our decision in Butte Country Club which is inconsistent with this opinion.  We conclude that  15-8-201, MCA (1993), does not render those assessments for which notices and levies were sent out on or after the second Monday in July 1993 invalid to the extent that taxes were increased by those assessments.  The District Court's conclusion to the contrary is reversed.

This case is remanded to the District Court for entry of judgment consistent with this opinion.

/S/  TERRY N. TRIEWEILER

We Concur:

/S/  J. A.  TURNAGE
/S/  WILLIAM E. HUNT, SR.
/S/  JIM REGNIER
/S/  JAMES C. NELSON
/S/  KARLA M. GRAY
/S/  W. WILLIAM LEAPHART