No. 97-315

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 41


BILLY B. MILLHOLLIN,

Plaintiff and Appellant,

v.

THE CONVEYOR COMPANY,

Defendant and Respondent.



APPEAL FROM:   District Court of the Sixteenth Judicial District,
In and for the County of Rosebud,
The Honorable Joe L. Hegel, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Richard C. Conover, Attorney at Law, Bozeman, Montana

A. Lance Tonn; Lucas & Monaghan, Miles City, Montana

For Respondent:

Neil G. Westesen; Crowley, Haughey, Hanson, Toole & Dietrich,
Billings, Montana



Submitted on Briefs: October 16, 1997

Decided:    February 24, 1998
Filed:


_____
Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

¶1    Billy B. Millhollin (Millhollin) appeals from the judgment entered by the Sixteenth Judicial District Court, Rosebud County, on its order granting the motion for summary judgment filed by The Conveyor Company (TCC) and denying his summary judgment motion.  We affirm.


¶2    The dispositive issue on appeal is whether the District Court erred in concluding that

TCC did not breach its contract with Millhollin and in granting TCC's motion for summary judgment on that basis.

BACKGROUND

¶3   Millhollin invented a device for aligning conveyor belts which he called a Conveyor Belt Return Training Device (Belt Trapper).  He applied for a United States patent for the invention in 1991, and the patent was issued on April 27, 1993.

¶4   In 1992, Millhollin and TCC entered into an Agreement regarding the Belt Trapper. Millhollin granted TCC the exclusive right to make, use and sell the Belt Trapper in both the United States and foreign countries and, in return, TCC agreed to pay Millhollin a royalty on each Belt Trapper it sold, plus a percentage of the price of all replacement parts and accessories it sold, with a guaranteed minimum payment to Millhollin in each of the first five years covered by the Agreement.  During both the United States patent application process and the negotiation of the Agreement, Millhollin was represented by Bozeman attorney Richard Conover (Conover).

¶5   Article VI of the Agreement gave TCC the right to pursue additional patent applications, both foreign and domestic, at its own expense.  In the event TCC chose not to file any patent applications, Millhollin retained the right to do so at his own expense.  The Agreement further required TCC to assign any patent applications it filed to Millhollin.

¶6   TCC decided to file foreign patent applications for the Belt Trapper in Europe and Canada.  It requested Conover to file the applications because of his familiarity with the earlier United States patent application.  Conover filed the requested European and Canadian patent applications and TCC paid the fees and expenses he incurred.  Eventually, however, TCC decided to use a different attorney to pursue the foreign patent applications because it believed the fees and expenses charged by Conover were too high.  TCC informed Conover of its decision to terminate his services via a letter which also stated that a check for the balance due him was being sent to its corporate attorney, Robert Dwyer (Dwyer), who would forward the check to Conover after TCC received all of the files pertaining to the foreign patent applications from Conover. Acting on instructions from Millhollin, Conover refused to turn the patent application files over to TCC.  As a result, Dwyer did not forward payment for the remainder of Conover's bill.

¶7   Millhollin subsequently sent TCC a written notice of default which asserted that TCC was in breach of Article VI of the Agreement by failing to pay the expenses incurred in its pursuit of the foreign patent applications; the notice gave TCC 30 days to remedy the alleged breach by paying Conover's bill in full.  Because the patent application files still had not been received from Conover, TCC did not make payment within 30 days.

¶8   Thereafter, Millhollin declared that the Agreement was terminated, pursuant to Article XII, and filed this declaratory judgment action requesting the District Court to declare that the Agreement was properly terminated.  He also requested an award of damages, including reimbursement of the amount he paid Conover for the patent application-related expenses which TCC had not paid.

¶9   TCC and Millhollin both moved for summary judgment.  The District Court granted TCC's motion and denied Millhollin's, concluding that TCC had not breached the Agreement and that, even if a breach had occurred, it was not sufficiently material to justify termination of the Agreement.  Judgment was entered and Millhollin appeals.

STANDARD OF REVIEW

¶10   We review a district court's summary judgment ruling de novo, using the same Rule 56, M.R.Civ.P., criteria as the district court.  Clark v. Eagle Systems, Inc. (1996), 279 Mont. 279, 283, 927 P.2d 995, 997 (citations omitted).  Pursuant to Rule 56(c), M.R.Civ.P., the moving party must establish, in light of the pleadings and other evidence before the court, the absence of any genuine issue of material fact and entitlement to judgment as a matter of law.  Clark, 927 P.2d at 997-98 (citations omitted).  Only when this initial burden has been met must the nonmoving party come forward with evidence raising a genuine issue of material fact.  Clark, 927 P.2d at 998.

¶11   Ordinarily, our review in summary judgment cases begins with a determination of whether the moving party established the absence of disputed and material fact issues. See, e.g., Montana Metal Buildings, Inc. v. Shapiro (Mont. 1997), 942 P.2d 694, 696-97, 54 St.Rep. 731, 732.  Here, however, Millhollin does not contend that a genuine issue of material fact exists.  He argues only that the District Court erred in concluding that TCC did not breach the Agreement and that it was entitled to summary judgment on that basis.  We review a district court's conclusions of law to determine whether those conclusions are correct.  Albright v. State, by and through State (1997), 281 Mont. 196, 205, 933 P.2d 815, 821.

DISCUSSION

¶12       Did the District Court err in concluding that TCC did not breach its contract with Millhollin and in granting TCC's motion for summary judgment on that basis?

¶13   In concluding that TCC did not breach the Agreement, the District Court determined that Article VI of the Agreement granted TCC the primary right to pursue the foreign patent applications, which right necessarily included the right to possession of the files created by an attorney, at TCC's expense and direction, during the patent application process.  On that basis, the District Court concluded that TCC "had the right to legally tender payment to attorney Conover conditioned on receipt of the files for which it had paid" and that this conditional tender of payment was not a breach of the Agreement between TCC and Millhollin.

¶14   Millhollin raises several arguments in support of his overall contention that the District Court's conclusions were erroneous.  He first argues that TCC's tender of payment was not legally sufficient to avoid breaching the Agreement because a tender of payment in fulfillment of a contractual obligation cannot be qualified or conditional.  His underlying legal premise, however, is incorrect.  A tender of payment may be conditional as long as the attached condition is one on which the tenderer has the right to insist.  See § 28-1-1211, MCA; Advance-Rumely Thresher Co., Inc. v. Hess (1929), 85 Mont. 293, 301, 279 P. 236, 238; 74 Am. Jur. 2d Tender  24 (1974).  Thus, whether TCC's conditional tender of payment to Conover was sufficient to avoid breaching the Agreement depends on whether TCC had the right to insist that Conover deliver the patent application files to TCC, and this question leads directly to Millhollin's second assertion of error regarding the District Court's conclusion that TCC did not breach the Agreement.

¶15   Millhollin asserts that, as the inventor of the Belt Trapper, he retains complete ownership of the invention, the patent applications and the patent application files and, because of his sole ownership, TCC had no right to possession of the files.  Thus, he contends that TCC did not have the right to insist on delivery of the foreign patent application files as a condition of its paying the outstanding fees and expenses related thereto

and, as a result, TCC's conditional tender of payment was not sufficient to avoid breaching the Agreement. We disagree.

¶16 Prior to obtaining a patent on an invention, an inventor possesses inchoate rights to the exclusive use of the invention and to apply for a patent thereon. Hendrie v. Sayles (1878), 98 U.S. (8 Otto) 546, 551, 25 L.Ed. 176, 178; Gayler v. Wilder (1850), 51 U.S. (10 How.) 466, 467, 13 L.Ed. 504, 511. Once obtained, a patent confers upon the patentee the right to exclude others from manufacturing, using or selling the invention during the life of the patent. 35 U.S.C. § 154; Bell Intercontinental Corp. v. United States (Ct. Cl. 1967), 381 F.2d 1004, 1010. A patent has the attributes of personal property and is owned by the holder of the patent. 35 U.S.C. § 261; see, also, Cammeyer v. Newton (1876), 94 U.S. (4 Otto) 225, 226, 24 L.Ed. 72, 72.

¶17 However, an inventor may assign ownership of an invention, a patent or a patent application to another. See 35 U.S.C. § 261; Kenyon v. Automatic Instrument Co. (6th Cir. 1947), 160 F.2d 878, 882. For an agreement to constitute an assignment granting ownership title to an invention or patent, it must confer on the assignee the rights to make, use and sell the invention. Kenyon, 160 F.2d at 882. In other words, the agreement must indicate the inventor's intent to transfer all of his or her substantial rights in the invention to the assignee. Bell Intercontinental, 381 F.2d at 1011. A transfer by the inventor of anything less than the full rights to make, use and sell an invention constitutes only a license and does not give the licensee any ownership title in the invention or patent. Kenyon, 160 F.2d at 882.

¶18 Millhollin asserts that his Agreement with TCC is merely a license granting TCC the right to use the Belt Trapper, rather than an assignment transferring ownership of the invention and related patents to TCC. We note that Millhollin refers to the Agreement as the "License Agreement" in an attempt to buttress his argument. However, the document at issue here is clearly entitled "Agreement" and not "License Agreement."

¶19 Moreover,
    whether the transfer of an interest or right under a patent is an assignment or
    a license, does not depend upon the name by which it is called, but upon the
    legal effect of its provisions. No particular form is required for an assignment
    but the instrument of transfer must be unambiguous and show a clear and
    unmistakable intent to part with the patent.

Kenyon, 160 F.2d at 882 (citing Waterman v. MacKenzie (1891), 138 U.S. 252, 256, 11 S.Ct. 334, 335, 34 L.Ed. 923, 925-26). Thus, a contract which conveys the right to make, use and sell an invention for the entire term of the patent is an assignment vesting title to the entire patent in the assignee without regard to its heading as a "license contract." Kenyon, 160 F.2d at 883. Consequently, Millhollin's references to the Agreement as a "License Agreement" do not establish that it created a license rather than an assignment of title; nor does the fact that the Agreement itself repeatedly refers to the "Licensed Product" establish that it is a mere license. Rather, the extent of the rights conferred under the Agreement is determinative.

¶20 While language in an agreement by which an inventor grants exclusive rights to make, use and sell an invention is the primary indicator of an inventor's intent to assign ownership of an invention or patent, there are additional factors which are indicative of an intent to assign ownership. For example, an inventor's conveyance of the right to sue patent infringers is a fundamental characteristic of an assignment. Sybron Transition v. Nixon, Hargrave, et al. (W.D.N.Y. 1991), 770 F.Supp. 803, 808 (citing Waterman, 138 U.S. at 255). A transfer

of the right to manufacture, use and sell an invention for the full term of the patent on that invention, rather than a transfer for a period less than the remaining life of the patent, also is indicative an assignment rather than a mere license to use. Bell Intercontinental, 381 F.2d at 1020. Further, an agreement which does not allow the grantor to terminate at will prior to the expiration of the patent indicates that the grantor intends an assignment of the invention or patent. Bell Intercontinental, 381 F.2d at 1022. Retention by the grantor of the right to terminate the agreement upon the grantee's default or the occurrence of some other subsequent event beyond the grantor's control, however, is not inconsistent with an assignment of ownership. Bell Intercontinental, 381 F.2d at 1011.

¶21 With these considerations in mind, we examine the Agreement here to determine the extent of the rights conferred by Millhollin to TCC. Of primary note is Article II of the Agreement, where Millhollin "hereby grants to [TCC] the exclusive rights to make, use and sell the [Belt Trapper] in the United States and throughout the world." The Agreement also provides, in Article VII, that the Agreement will "continue in effect until the last patent . . .
obtained anywhere in the world and covering the [Belt Trapper] expires." Along the same lines, Article XI grants TCC the rights to bring patent infringement lawsuits, to have exclusive control over prosecuting infringement suits and to retain all proceeds resulting from any infringement suits. Finally, the Agreement provides that it may not be terminated by either Millhollin or TCC except upon a failure by the other party to fulfill obligations under the Agreement or upon the occurrence of either of two specified events which are not at issue in this case.

¶22 Millhollin's grant to TCC of the exclusive right to make, use and sell the Belt Trapper for the entire term of any patents on the invention, combined with the grant of the right to bring patent infringement suits and Millhollin's failure to retain a right to terminate the Agreement at his discretion, manifests an intent by Millhollin to "surrender all his substantial rights to the invention" and assign those rights to TCC. See Bell Intercontinental, 381 F.2d at 1011. Indeed, in Bell Intercontinental, one of the agreements at issue contained provisions nearly identical to the Agreement here in that it granted the exclusive right to manufacture, use and sell the invention, the agreement was to continue until the expiration of the last patent that might issue on the invention, the grantee had the right to bring patent infringement suits and retain any recovery from such suits, and the grantor had no unilateral right to terminate the agreement. Bell Intercontinental, 381 F.2d at 1011-13. There, the United States Court of Claims determined that the grantor had divested itself of all control and ownership in the invention and assigned ownership of the invention to the grantee for the life of all patents issued thereon. Bell Intercontinental, 381 F.2d at 1013. Here, based on the terms of the Agreement before us, we conclude that Millhollin similarly assigned his ownership of the Belt Trapper to TCC.

¶23 Millhollin's assignment to TCC of the ownership of the Belt Trapper has two significant results. First, when ownership rights to an invention are assigned prior to obtaining a patent thereon, the assignee will receive the legal title to the patent when it is subsequently issued. Filmtec Corp. v. Allied-Signal, Inc. (Fed. Cir. 1991), 939 F.2d 1568, 1572 (citing Gayler, 51 U.S. at 467). Thus, when the United States patent on the Belt Trapper was granted in April of 1993, legal title to that patent vested in TCC. Additionally, Millhollin's assignment to TCC of his entire interest in the Belt Trapper carried with it the inchoate right to file patent applications on the invention, even absent any corresponding provision in the Agreement. See Toner v. Sobelman (E.D. Pa. 1949), 86 F.Supp. 369, 380 (citations omitted). Consequently, Millhollin has not only assigned ownership of the Belt Trapper to TCC, he has also divested himself of control and ownership of the patents and patent applications related to the Belt Trapper.

¶24 As additional support for his argument that he retained complete ownership of the Belt

Trapper, the patents and the patent applications, Millhollin points out that Article VI, Paragraph B of the Agreement provides that all patent applications filed by TCC shall be assigned to Millhollin. However, the fact that the patent applications "shall be assigned" to him does not support his assertion that he "retained" ownership of the patent applications. Rather, the term "shall be assigned" connotes a present ownership of the applications in TCC and only a future ownership in Millhollin. Indeed, the patent applications had not been assigned to Millhollin at the time the dispute at issue here arose.

¶25 Millhollin's argument in this regard is also unpersuasive in light of Article XII, Paragraph D of the Agreement, which provides that, in the event the Agreement is terminated as a result of a default by TCC, TCC shall assign to Millhollin, among other things, all patents and patent applications pertaining to the Belt Trapper. Again, the provision that TCC "shall assign" the patent applications to Millhollin implies that TCC is the present owner of the applications. Absent an assignment to Millhollin, TCC retains its ownership interest in, and control over the prosecution of, the patent applications.

¶26 We conclude that the terms of the Agreement between TCC and Millhollin constituted an assignment to TCC of the ownership rights in the patent applications at issue here and that TCC accordingly maintained full control over the manner in which the applications were pursued. As a result, Millhollin's argument that TCC had no right to insist on possession of the application files, based on his erroneous assertion that he owned the patent applications and related files, fails. On this basis, we further conclude that the District Court did not err in determining that TCC had the right to tender payment to Conover conditioned on Conover delivering possession of the application files to which it was entitled to TCC.

¶27 Most of Millhollin's remaining arguments in support of his assertions of error by the District Court are premised on his flawed contention that he maintained ownership of the patent applications and related files. As a result of our conclusion that Millhollin has assigned ownership of the Belt Trapper, the existing United States patent and all patent applications to TCC, we need not address those arguments.

¶28 Millhollin's final argument is that the application files could not be turned over to Dwyer, TCC's corporate attorney, without Millhollin's permission because transferring the files would have created a serious conflict of interest for Dwyer. Millhollin contends that, if the files were given to Dwyer to complete the patent application process, Dwyer would be required to act in a dual representative capacity as an attorney for both TCC and Millhollin, which could not be allowed without Millhollin's consent. Millhollin did not raise this argument in the District Court and, as a result, we decline to address it on appeal. See Matter of R.B.O. (1996), 277 Mont. 272, 283, 921 P.2d 268, 274.

¶29 We conclude that Millhollin has failed to establish any error in the District Court's determination that TCC had the right to tender payment of the amount due to Conover conditioned on Conover delivering possession of the patent application files to TCC. We hold, therefore, that the District Court did not err in concluding that TCC did not breach the Agreement with Millhollin and in granting TCC's motion for summary judgment on that basis.

¶30 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/  J. A.  TURNAGE
/S/  JAMES C. NELSON
/S/  TERRY N. TRIEWEILER
/S/  W. WILLIAM LEAPHART