No. 98-495

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 30

THEODORE ROOSEVELT, IV,

Petitioner and Respondent,

v.

MONTANA DEPARTMENT OF REVENUE,

Respondent and Appellant.

APPEAL FROM: District Court of the Tenth Judicial District,

In and for the County of Fergus,

The Honorable John Christensen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Lawrence G. Allen (argued) and Patrick N. Dringman,

Tax Counsels; Department of Revenue; Helena, Montana

For Respondent:

James A. Hubble (argued), Attorney at Law; Stanford, Montana

For Amicus Curiae:

Donald R. Herndon (argued); Herndon, Sweeney & Halverson, P.C.;

Billings, Montana (for amicus Jeffrey Vern Essmann)

Heard: December 29, 1998

Submitted: February 2, 1999

No

Decided: February 19, 1999

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. Theodore Roosevelt, IV, who was designated the petitioner, and the Montana Department of Revenue, which was designated the respondent, filed a joint petition in the District Court for the Tenth Judicial District in Fergus County for interlocutory adjudication pursuant to §§ 15-2-304 and -305, MCA, of legal issues raised before the Montana State Tax Appeal Board (STAB). The parties asked the District Court to determine whether the 2% phase-in of changes in real property value, as set forth in § 15-7-111, MCA, violated the United States or Montana Constitutions, or Montana statutory law. After considering written briefs submitted by the parties and hearing oral argument, the District Court concluded that § 15-7-111(1), MCA (1997), is unconstitutional on its face and in conflict with other statutory law pertaining to the valuation and assessment of real property in Montana. The Department appeals the judgment of the District Court. We affirm that judgment in part, as applied to the petitioner, Theodore Roosevelt, IV.**

**¶2. We limit our consideration of the issues raised on appeal to the question of whether, as applied to the petitioner, § 15-7-111(1), MCA (1997), violates his right to equal protection of the laws, as guaranteed by Article II, Section 4, of the Montana Constitution.**

## FACTUAL AND PROCEDURAL BACKGROUND

**¶3. The following facts are taken from the parties' joint petition to the District Court. They are agreed upon by the parties and are the only facts of record.**

**¶4. Theodore Roosevelt, IV, owns real property and improvements to that property which are located in Fergus County, Montana. At issue in this case is the 1997 taxable value of two improvements to that real property.**

¶5. In 1996, the market value of the property at issue was appraised by the Montana Department of Revenue at $890,850. In 1997, the Department appraised that same property at $701,890. Roosevelt filed an appeal with the Fergus County Tax Appeal Board challenging the 1997 valuation. For purposes of calculating the 1997 value, the county board reduced Roosevelt's 1996 appraised value to $820,597, and his 1997 appraised value to $658,840. Pursuant to § 15-7-111(1), MCA (1997), the Department then phased in the amount of change in valuation at the rate of 2% per year beginning in 1997. In other words, although the appraised value of Roosevelt's property declined by $161,757, he was given credit for only a $3,235 difference, and assessed property taxes based on a value of $817,362, rather than his actual 1997 appraised value of $658,840. The county board affirmed the Department's calculation of the 1997 phase-in value for Roosevelt's property.

¶6. Roosevelt appealed to the STAB to contest the legality of the 2% phase-in provision of § 15-7-111(1), MCA (1997). The parties then filed the joint petition to the District Court pursuant to § 15-2-305, MCA, which provides in relevant part that:

A district court may make an interlocutory adjudication of an issue pending before the state tax appeal board if that issue involves procedure, the admissibility of evidence, or a substantive question of law and does not require the determination of a question of fact.

¶7. The parties agreed that there were no disputed issues of fact and that the sole issue to be decided was as follows:

Whether the 2% phase in of changes in value, as set forth in § 15-7-111, MCA, is in violation of the United States and Montana constitutional requirements of equal protection and due process, and in violation of the Montana statutory requirement of property value equalization.

In the District Court, Roosevelt argued that:

¶8. 1. The phase-in provision violates Article VIII, Section 3, of the Montana Constitution, § 15-9-101(1), MCA, and § 15-8-111(1), MCA, which require the equalization of property values for purposes of taxation.

¶9. 2. The phase-in provision violates Article VIII, Section 7, of the Montana Constitution, which guarantees a property owner the right to appeal appraisals and assessments because a property owner cannot, in fact, receive a reduction on appeal based on the true market value of his or her property.

¶10. 3. The phase-in provision violates the rights to equal protection of laws and due process guaranteed by the United States and Montana Constitutions, as interpreted in *Department of Revenue v. Barron* (1990), 245 Mont. 100, 799 P.2d 533, and *Department of Revenue v. Sheehy* (1993), 262 Mont. 104, 862 P.2d 1181.

¶11. The Department responded that:

¶12. 1. Article VIII, Section 3, merely provides for appraisal, assessment, and equalization of value, as provided by law. Section 15-7-111(1), MCA (1997), is the method of appraisal and assessment provided for by law and there is no requirement that property be assessed at 100% of current market value.

¶13. 2. Article VIII, Section 7, of the Montana Constitution has not been violated because the Legislature has provided for tax appeal procedures at the local government level through §§ 15-15-101 to -106, MCA, and to the STAB through § 15-2-301, MCA.

¶14. 3. Neither Roosevelt's right to equal protection nor his right to due process has been violated because he has been treated like every other property owner in the state. Rather than *Barron* and *Sheehy*, the Court should be guided on this point by *Nordlinger v. Hahn* (1992), 505 U.S. 1, 112 S. Ct. 2326, 120 L. Ed. 2d 1.

¶15. Following written briefs and arguments by the parties, the District Court found that Roosevelt's taxes, based on the 1997 phased-in value, were $11,246.31, but that his taxes based on his actual market value would have been $9,065.13, for a difference of $2,181.18. The Court found that for the year 1997 the phase-in provision of the 1997 amendment to § 15-7-111(1), MCA, required that Roosevelt pay property taxes based on a valuation which is 124% of the market value of his Class Four property, and concluded, based on the statute, that it would take fifty years for Roosevelt's property to be assessed at its fair market value. Although the Department questions the District Court's fifty-year conclusion, the court's previously referred to findings are not challenged on appeal.

¶16. Based on its findings, the District Court agreed that the phase-in provision violates Article VIII, Sections 3 and 7, of the Montana Constitution, and the Equal Protection and Due Process Clauses of both the United States and Montana Constitutions.

¶17. On appeal, the parties' arguments are similar to those raised in the District Court, although the Department argues additionally that the District Court assumed facts not in evidence as the basis for its opinion.

¶18. Except where necessary, we will not repeat the parties' arguments in detail, nor do we find it necessary to address all of the issues raised in the District Court or decided by the District Court since we conclude that the District Court's judgment, as it applies to the parties who were before it, is correct based on the District Court's application of the Equal Protection Clause of the Montana Constitution. Therefore, we will limit our discussion to the following issue:

¶19. As applied to the petitioner and similarly situated property owners, does § 15-7-111(1), MCA (1997), violate the right to equal protection as guaranteed by Article II, Section 4, of the Montana Constitution?

DISCUSSION

¶20. Article VIII, Section 3, of the Montana Constitution, provides that "[t]he state shall appraise, assess, and equalize the valuation of all property which is to be taxed in the manner provided by law."

¶21. Pursuant to that mandate, the Legislature enacted the following requirement regarding the appraisal of real property in Montana: "The same method of appraisal and assessment shall be used in each county of the state to the end that comparable property with similar true market values and subject to taxation in Montana shall have substantially equal taxable values at the end of each cyclical revaluation program hereinbefore provided." Section 15-7-112, MCA.

¶22. The Legislature further provided, at § 15-8-111, MCA, that all taxable property must be assessed at 100% of its market value, except as otherwise provided, and at § 15-9-101(1), MCA, that:

No

The department shall adjust and equalize the valuation of taxable property among the several counties . . . and between individual taxpayers and shall do all things necessary to secure a fair, just, and equitable valuation of all taxable property among counties . . . and between individual taxpayers.

**¶23. The combined effect of these provisions requires standardized appraisal methods throughout the state with the ultimate goal that the valuation of taxable property be equalized among the various counties in the state and among individual taxpayers, and that once equalized, that property be assessed for tax purposes at 100% of its market value, except as otherwise provided. As part of that statutory framework for appraisal, valuation, and assessment of real property, § 15-7-111, MCA (1995), required that property within the State of Montana be revalued by the Department by December 31, 1996, and revalued at least every three years. However, in 1997, the Montana State Legislature became concerned that general increases in the value of real property throughout the State of Montana would result in substantial increases in those taxes derived from real property, impose a hardship on those property owners whose property had appreciated in value, and produce more revenue to the state than was necessary.[1] Therefore, in 1997, the Legislature amended § 15-7-111, MCA, to include the following phase-in provision which is at issue in this case:**

(1) The department of revenue shall administer and supervise a program for the revaluation of all taxable property within classes three, four, and ten. All other property must be revalued annually. The revaluation of class three, four, and ten property is complete on December 31, 1996. The amount of the change in valuation from the 1996 base year for each property in classes three, four, and ten must be phased in each year at the rate of 2% of the total change in valuation.

. . . .

(3) Beginning January 1, 2007, the department of revenue shall administer and supervise a program for the revaluation of all taxable property within classes three, four, and ten. . . . The reappraisal plan adopted must provide that all class three, four, and ten property in each county is revalued by January 1, 2010, and each succeeding 3 years.

(Emphasis added.)

**¶24. The Legislature's amendment had the intended effect on those properties which appreciated in value in 1997. Along with reductions in the tax rate at § 15-6-134(2), MCA (1997), and limits on the mills that could be levied at § 15-10-402, MCA (1997), tax increases for those property owners were minimized or avoided. However, for those people in Roosevelt's situation, tax decreases which would have resulted from the reduction in the market value of property were not fully realized. While property owners whose property increased in value during 1997 are now taxed at less than the market value of their property, Roosevelt's taxes are assessed on 124% of the market value of his property. The question is whether this result violates Roosevelt's right to equal protection of the laws guaranteed by Article II, Section 4, of the Montana Constitution.**

**¶25. The District Court's conclusion that § 15-7-111(1), MCA (1997), is unconstitutional facially, is a conclusion of law. The standard of review for questions of law is whether they are correct.** *See Albright v. Department of Revenue* **(1997), 281 Mont. 196, 206, 933 P.2d 815, 821.**

**¶26. It is presumed that all legislative enactments are constitutional. The party challenging the constitutionality of a statute bears the burden of proving the statute unconstitutional beyond a reasonable doubt.** *See State v. Nye* **(1997), 283 Mont. 505, 510, 943 P.2d 96, 99.**

**¶27. When we review legislation for compliance with the Equal Protection Clause, the first and often determinative question is the level of scrutiny to be applied. Strict scrutiny, which requires a compelling state interest for statutory classifications which treat otherwise similarly situated individuals differently, is reserved for those situations where a statutory classification "impermissibly interferes with the exercise of a fundamental right or operates to a peculiar disadvantage of a suspect class."** *Arneson v. Department of Admin.* **(1993), 262 Mont. 269, 272, 864 P.2d 1245, 1247.**

**¶28. Roosevelt does not contend that he is a member of a suspect class, nor that a fundamental right is involved.**

**¶29. We have adopted a middle tier of scrutiny where important rights are involved, even though those rights are not considered fundamental. Rights important enough**

to warrant middle-tier scrutiny, although not considered fundamental, include rights which, although mentioned in the Constitution, are not found in Montana's Declaration of Rights. *See Butte Community Union v. Lewis* (1986), 219 Mont. 426, 434, 712 P.2d 1309, 1314.

¶30. Roosevelt contends that the classifications created by § 15-7-111(1), MCA (1997), implicate his constitutional right to equalized valuation guaranteed by Article VIII, Section 3, of the Montana Constitution, and, therefore, that the statute should be scrutinized for compliance with the Equal Protection Clause based on a middle-tier review.

¶31. In those cases which do not involve classifications which implicate fundamental rights, constitutionally significant interests, or discrimination based on a suspect class, we will review the classification for whether it bears a rational relationship to a legitimate governmental objective. *See Arneson*, 262 Mont. at 272-73, 864 P.2d at 1248. While the Department does not directly address the appropriate level of scrutiny since its principal contention is that the statute creates no classifications, its secondary arguments assume that the statute will be reviewed for the purpose of determining whether any classifications that it does create are rationally related to a legitimate state interest.

¶32. We conclude that because § 15-7-111(1), MCA (1997), as applied to Roosevelt, is not rationally related to a legitimate state interest, it is not necessary to decide whether a higher level of scrutiny applies to classifications created for the purpose of property tax assessment.

¶33. It is clear to us, as it was to the District Court, that § 15-7-111(1), MCA (1997), results in three classifications of Class Four property taxpayers:

¶34. 1. The first class includes those Class Four property owners whose market value declined from 1996 to 1997 and who were, therefore, assessed in 1997 based on a value greater than the market value of their property.

¶35. 2. The second class includes those Class Four property owners whose market value did not change from 1996 to 1997 and whose property is, therefore, being assessed based on its actual market value.

¶36. 3. The third class includes those Class Four property owners whose property increased in value from 1996 to 1997 and who were, therefore, assessed in 1997 based on a value less than the fair market value of their property.

¶37. The Department points to the Legislature's concern about a windfall in revenue based on increased property values, and to the statement of purpose found at § 15-10-401, MCA (1997), which provides in relevant part as follows:

(1) The state of Montana's reliance on the taxation of property to support education and local government has placed an unreasonable burden on the owners of all classes of property described in Title 15, chapter 6, part 1.

(2) Except as provided in 15-10-412, the people of the state of Montana declare that it is the policy of the state of Montana that no further property tax increases be imposed on property.

¶38. Although we agree that there is a legitimate state interest in reducing reliance on property taxes and avoiding further property tax increases, we conclude that taxing property owners, such as Roosevelt, based on 124% of the market value of his property, while taxing others in the state at less than the full market value of their property, is not rationally related to those objectives. Furthermore, we conclude that creating a class of property owners whose taxes are assessed on a basis greater than the market values of their property while other property owners are assessed based on the actual, or less than the actual market values of their property, causes the property owners in the first class to pay a disproportionate share of this state's property taxes, in violation of the Equal Protection Clause found at Article II, Section 4, of the Montana Constitution, as applied by this Court in *Barron* and *Sheehy*. In fact, the effect of the classifications created by the 1997 amendment to § 15-7-111(1), MCA (1997), are very similar to those which this Court held unconstitutional in *Barron*.

¶39. In *Barron*, the issue was the constitutionality of a former provision in § 15-7-111, MCA (1989), which provided for "stratified sales assessment ratio studies" and assessments based on the results of those studies. Following the studies, the actual sales prices of residential property in a given area were compared to the appraised values of those same properties for the previous three years. If the average assessed

**value of property in that area was more than 5% less than the average sales price, or more than 5% greater than the average sales price, then all appraised values were to be adjusted by the percentage of difference to arrive at the property's taxable value. We noted that the impacts of the adjustment had different effects on different property owners depending on the ratio of the appraised value of that person's property to the market value of that person's property and, therefore, that those persons whose appraised value exceeded their market value would be taxed at more than the market value and, therefore, taxed disproportionately. We gave the following example:**

It may be demonstrated by the above samples that equalization is not achieved by the application of the 30% factor but rather that any inequality of appraisal is exacerbated by the factor. For example, the first property, which sold for $24,000 in 1989 but was appraised for $46,497 is now assessed after the application of the factor, at $61,346. That same property was overappraised in relation to its sales price at 193% before the application of the factor, but is overappraised 255% after its application.

*Barron*, 245 Mont. at 108, 799 P.2d at 538.

**¶40. Based on those facts, we held as follows:**

We determine, therefore, from the record that the methodology prescribed by the legislature and implemented by the DOR for yearly equalization between areas unfairly discriminates against property taxpayers in Area 2.1 whose properties in 1989 were appraised at or above their market values.

. . . .

We therefore determine in accord with *Larson* [*v. Department of Revenue* (1975), 166 Mont. 449, 534 P.2d 854,] that the use of the 1990 tax values derived from the ratio studies and the application of the 30% factor to residential properties in Area 2.1 require certain taxpayers therein to bear a disproportionate share of Montana's tax burden in violation of the Equal Protection requirements of the Fourteenth Amendment of the United

States Constitution, and Art. II, § 4, 1972 Montana Constitution, and the Due Process requirements of the Fifth and Fourteenth Amendments of the United States Constitution and Art. II, §§ 17 and 29 of the 1972 Montana Constitution. This also violates the appraisal provisions of our statutes which require general and uniform appraisal, assessment and equalization of all taxable property in this state.

*Barron*, 245 Mont. at 108-11, 799 P.2d at 538-40.

**¶41. We conclude that just as the stratified sales assessment ratio methodology referred to in *Barron* discriminated against properties which were appraised at or above their market value and, therefore, required those property owners to "bear a disproportionate share of Montana's tax burden, in violation of the equal protection requirements," § 15-7-111(1), MCA (1997), discriminates against those Class Four property owners whose property declined in value from 1996 to 1997, and requires that they bear a disproportionate share of Montana's tax burden, in violation of Article II, Section 4's requirement that Montana's citizens be provided with equal protection of the laws.**

**¶42. The Department contends that the United States Supreme Court's decision in *Nordlinger v. Hahn* (1992), 505 U.S. 1, 112 S. Ct. 2326, 120 L. Ed. 2d 1, requires that we conclude that the 2% phase-in provision enacted in 1997 does not violate Roosevelt's right to equal protection.**

**¶43. In *Nordlinger*, the issue was whether California's constitutional requirement that real property be taxed at its "acquisition value," rather than its current market value, unfairly discriminated against recent property purchasers in favor of those owning similar pieces of property, but which had been purchased years earlier at a lower price. The Supreme Court held that California had demonstrated at least two rational bases for its "acquisition value" system of taxation. It concluded that the state had a legitimate interest in local neighborhood preservation, continuity, and stability which was furthered by permitting longer term owners to pay progressively less than new owners of comparable property, and it held that the state could legitimately conclude that a new owner of property does not have the same degree of reliance on protection against higher taxes as does an existing owner. *See Nordlinger*, 505 U.S. at 12, 112 S. Ct. at 2333, 120 L. Ed. 2d at 13-14. *Nordlinger* is distinguishable from this case for two reasons. First, Montana does not have an "acquisition value"**

system of taxation. Second, as we have previously held, this state's discriminatory treatment of Roosevelt is not reasonably related to its objective of avoiding tax increases.

¶44. We conclude that to the extent that federal authority is persuasive, the United States Supreme Court's decision in *Allegheny Pittsburgh Coal Co. v. County Commissioners of Webster County, West Virginia* (1989), 488 U.S. 336, 109 S. Ct. 633, 102 L. Ed. 2d 688, is more closely on point. In that case, the tax assessor for Webster County, West Virginia, assessed property at 50% of its appraised value, but fixed appraised value at the consideration for which the property had last sold. When properties had not sold recently, some adjustment was made, but the adjustment was not comparable to actual increase in market value. The Supreme Court noted that "[t]his approach systematically produced dramatic differences in valuation between petitioners' recently transferred property and otherwise comparable surrounding land." *Allegheny*, 488 U.S. at 341, 109 S. Ct. at 637, 102 L. Ed. 2d at 695.

¶45. Without any indication that West Virginia's tax system was based on "acquisition value," or that the state of West Virginia had demonstrated a rational basis for the discriminatory treatment of property owners in the petitioner's position, the Court held that the county assessor's method of arriving at market value violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Allegheny*, 488 U.S. at 343, 109 S. Ct. at 637, 102 L. Ed. 2d at 696. In language relevant to this case, the Supreme Court held that:

The use of a general adjustment as a transitional substitute for an individual reappraisal violates no constitutional command. As long as general adjustments are accurate enough over a short period of time to equalize the differences in proportion between the assessments of a class of property holders, the Equal Protection Clause is satisfied. Just as that Clause tolerates occasional errors of state law or mistakes in judgment when valuing property for tax purposes, it does not require immediate general adjustment on the basis of the latest market developments. In each case, the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners.

*Allegheny*, 488 U.S. at 343, 109 S. Ct. at 638, 102 L. Ed. 2d at 697 (citations omitted).

Likewise, we conclude that general adjustments over a short period of time to equalize the treatment of similarly situated property holders is permissible. However, pursuant to our Constitution, seasonable attainment of the equality is required. The 2% phase-in provision at issue in this case does not adjust values over a short period of time and does not result in seasonable attainment of equality in tax treatment of similarly situated property owners.

**¶46. We therefore affirm the District Court's judgment to the extent that it concluded that § 15-7-111(1), MCA (1997), as applied to Theodore Roosevelt, IV, violates his right to equal protection of the laws. However, we reverse that part of the District Court's judgment which held that § 15-7-111(1), MCA (1997), is unconstitutional on its face. To violate equal protection "on its face" means that "the law by its own terms classifies persons for different treatment." Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 18.4 (2d ed. 1992). In this case, the terms of § 15-7-111(1), MCA (1997), make no specific classifications. On its face, the statute is neutral. However, as applied to the three classes previously described, the statute imposes different burdens on each class. Therefore, our holding in this case is limited to our conclusion that § 15-7-111(1), MCA (1997), is discriminatory and, therefore, violates the right to equal protection, as applied to the petitioner.**

**¶47. Nor are we inclined to speculate about the constitutionality of the statute as applied to other classes of taxpayers. Other than for exceptional circumstances, which are not present in this case, we are limited in our decision-making authority to decide the issues raised by those cases or controversies presented to us. Based on our former Constitution, we have concluded that we are as limited as the federal courts to cases or controversies. In *Hardy v. Krutzfeldt* (1983), 206 Mont. 521, 672 P.2d 274, we explained that:**

"The judicial power vested in the district courts and the Supreme Court of Montana, by the provisions of the Montana Constitution, extend to such 'cases at law and in equity' as are within the judicial cognizance of the state sovereignty. Article 8, secs. 3, 11, [1889 Montana Constitution.] By 'cases' and 'controversies' within the judicial power to determine, is meant real controversies and not abstract differences of opinion or moot questions. Neither federal nor state Constitution has granted such power."

*Hardy*, 206 Mont. at 526, 672 P.2d at 276 (quoting *Chovanak v. Matthews* (1948), 120

Mont. 520, 525-26, 188 P.2d 582, 584).

**¶48. We have followed this same principle of judicial restraint since the adoption of our new Constitution in *Olson v. Department of Revenue* (1986), 223 Mont. 464, 726 P.2d 1162. There we stated that:**

At the threshold of every case, especially those where a statutory or constitutional violation is claimed to have occurred, is the requirement that the plaintiff allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues ..." *Baker v. Carr* (1962), 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678. This principle is generally referred to as standing to sue, and there are two distinct bases upon which standing rests. The first is the constitutional provision which extends original jurisdiction of the District Court to "cases at law and in equity." Art. VII, Sec. 4, 1972 Mont. Const. This provision has been interpreted as embodying the same limitations as are imposed by federal courts under the Article 3 "case or controversy" provision of the United States Constitution. See, *Stewart v. Bd. of Cty. Com'rs of Big Horn Cty.* (1977), 175 Mont. 197, 573 P.2d 184. The second base of the doctrine is one of judicial self-restraint imposed for reasons of policy.

*Olson*, 223 Mont. at 469-70 726 P.2d at 1166 (emphasis added).

**¶49. The application of judicial restraint, derived from the Federal Constitution's requirement of a case or controversy, as applied to the issue of whether a statute should be found facially invalid, rather than as applied to the facts before the Court, is illustrated in the United States Supreme Court's decision in *United States v. Raines* (1960), 362 U.S. 17, 80 S. Ct. 519, 4 L. Ed. 2d 524. In that case, the United States prosecuted the board of registrars and various deputy registrars in Terrell County, Georgia, for discrimination on racial grounds against some persons who attempted to vote in state elections. The prosecution was based on provisions of the Civil Rights Act of 1957, which guaranteed the right to vote without regard to race, and granted the Attorney General authority to bring an action to enjoin the conduct of any person who would deprive another person of that right. The Federal District Court held the statute unconstitutional because it allowed the United States to enjoin purely private action, even though the complaint was based on only official action. The District Court held that because the statute on its face was susceptible of application beyond the scope of the Fifteenth Amendment, it was invalid in all its applications.**

**The U.S. Supreme Court explained its decision to reverse the district court in the following language applicable to this case:**

This Court, as is the case with all federal courts, "has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." . . . Very significant is the incontrovertible proposition that it "would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined. The Court further pointed to the fact that a limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were in fact concretely presented. We might add that application of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

*Raines*, 362 U.S. at 21-22, 80 S. Ct. at 522-23, 4 L. Ed. 2d at 529-30 (citations omitted).

**¶50. Likewise, we will not anticipate every conceivable fact situation to which the 1997 phase-in provision at issue could be applied and whether that statute is rationally related to the state's objective under those circumstances. We limit our holding to the facts before us and to those similarly situated Class Four property taxpayers whose actual market value declined from 1996 to 1997.**

## SUMMARY

**¶51. Because Roosevelt's property declined in value from 1996 to 1997, and because he is denied full recognition of that decline in value for purposes of assessment pursuant to the phase-in provision in § 15-7-111(1), MCA (1997), Roosevelt's 1997 property taxes are based on more than the market value of his property, while the property taxes of other property owners whose property did not decline in value are**

based on either market value or less than market value. We conclude that creating a class of property owners whose taxes are assessed on a basis greater than the market values of their property while other property owners are assessed based on the actual or less than the actual market values of their property, causes the property owners in the first class to pay a disproportionate share of this state's property taxes, in violation of the right to equal protection of the laws guaranteed by Article II, Section 4, of the Montana Constitution. Therefore, § 15-7-111(1), MCA (1997), as applied to Roosevelt, is unconstitutional and he and other similarly situated Class Four property owners are entitled to be assessed at the actual 1997 market value of their property for the purpose of calculating their 1997 property taxes.

¶52. This holding is limited to the facts before us and to similarly situated Class Four property owners whose property actually declined in value for 1996 to 1997. We reverse that part of the District Court judgment which held that the phase-in provisions in § 15-7-111(1), MCA (1997), are unconstitutional on their face. Whether the statute is unconstitutional as applied to other classes of property taxpayers depends on facts which are not before us and about which we decline to speculate. The constitutionality of § 15-7-111(1), MCA (1997), as applied to other classes of taxpayers, will have to await an actual case or controversy involving one of the members of those classes.

¶53. We affirm the judgment of the District Court in part and reverse in part, and remand to the District Court for entry of judgment consistent with this opinion.


/S/ TERRY N. TRIEWEILER


We Concur:


/S/ JIM REGNIER

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

No

Justice W. William Leaphart, dissenting.

**¶54. I dissent from the Court's conclusion that § 15-7-111, MCA, violates the Equal Protection Clause of the Montana Constitution as applied to Roosevelt. The statute is presumed to be constitutional. State v. Nye (1997), 283 Mont. 505, 510, 943 P.2d 96, 99. The party challenging a statute bears the burden of proving its unconstitutionality beyond a reasonable doubt, and if any doubt exists, it must be resolved in favor of the statute. Grooms v. Ponderosa Inn (1997), 283 Mont. 459, 467, 942 P.2d 699, 703.**

**¶55. The Court concludes that § 15-7-111(1), MCA (1997), is unconstitutional as applied to Roosevelt and others whose property values in 1997 decreased from their 1996 values. The Court holds that such property owners "are entitled to be assessed at the actual 1997 market value of their property for the purpose of calculating their 1997 property taxes." This conclusion assumes that 100% of current market value is the sole standard by which Class Four property can be assessed. However, neither the Montana Constitution nor the United States Constitution prohibit a deviation from that standard. Agricultural and forest lands, for example, have traditionally been assessed on their productive values rather than their market values. *See*, § 15-8-111(6)(c), (d), MCA. In Nordlinger v. Hahn (1992), 505 U.S. 1, 11-14, 112 S.Ct. 2326, 2332-34, 120 L.Ed.2d 1, 13-15, the United States Supreme Court held that California's Proposition 13, which taxed property based upon acquisition value, did not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution despite the fact that acquisition value may not even remotely represent current market value.**

**¶56. Prior to 1997, 100% of market value was the statutory standard for assessing Class Four property in Montana. However, the 1997 Legislature amended the tax code to provide for a system which no longer relied on 100% of current market value for Class Four property. Rather, the new system assessed and equalized property based on a derivative of its 1996 market value. Under the new system, each property was assigned a 1997 reappraisal value. Each property was then assessed on its 1996**

value plus or minus 2% of the difference between its 1997 reappraised value and its 1996 value. The above procedure is uniform and applies equally to all Class Four property owners. It is also consistent with the equalization requirements of Article VIII, Section 3 of the Montana Constitution, which provides: "The state shall appraise, assess, and equalize the valuation of all property which is to be taxed in the <u>manner provided by law</u>." Art. VIII, Sec. 3, Mont. Const. (emphasis added). Accordingly, I disagree with the Court's assumption that current (1997) market value is *the* standard by which we must determine whether there has been a violation of the right to equal protection.

¶57. The Equal Protection Clause of the Montana Constitution provides that similarly situated properties must be appraised and assessed in a uniform manner. Patterson v. State, Dep't of Revenue (1976), 171 Mont. 168, 175, 557 P.2d 798, 802. In *Patterson*, we addressed a 5-year appraisal plan in which 20% of all property, in each county, was appraised annually. In appraising 1/5 of the property each year, all property in the state of Montana would have been valued by the end of the 5-year cycle. *Patterson*, 171 Mont. at 174-75, 557 P.2d at 802. The taxpayers challenged this method, contending that properties valued in the first year of the cycle would be valued at a different market value than property appraised and assessed in the fifth year of the cycle. They argued, therefore, that this discrepancy would cause some property owners to pay a disproportionate share of taxes. *Patterson*, 171 Mont. at 176, 557 P.2d at 802. In upholding the cyclical revaluation or reappraisal method, this Court acknowledged that "temporary disparities within the cycle between individual property valuations both within the county and between counties are inevitable." *Patterson*, 171 Mont. at 176, 557 P.2d at 802. We thus concluded that the 5-year appraisal cycle satisfied the Montana statutory uniformity provisions and the equal protection provisions of both the state and federal constitutions, given that similar properties were assessed and appraised in a similar fashion statewide.

¶58. The system presently under consideration constitutes an improvement over the 5-year cycle involved in *Patterson*. In contrast to the situation in *Patterson,* where 1/5 of all property was appraised each year, under the present system, all property is appraised in the same base year. Under the phase-in provisions of § 15-7-111, MCA, all property was appraised and assessed under the same standard for tax year 1996. All taxpayers in Montana received exactly the same valuation treatment Roosevelt received. That is, the difference between the 1996 tax year value and the reappraised 1997 value of their property was phased in at the rate of 2% per year. That phase-in

was added to or subtracted from the property's 1996 value. More particularly, all properties similar to Roosevelt's (i.e., properties which declined in value in 1997) received similar treatment; such properties had their reduced 1997 value phased-in via a 2% reduction from the previous year's 1996 value.

¶59. All Class Four property is taxed at its 1996 value plus or minus 2% of the difference between its 1997 value and its 1996 value. All taxpayers have been treated the same and the same standard is applied to all similarly situated property statewide. In my view, this methodology does not, on its face, or as applied to Roosevelt, violate the equal protection guarantee.

¶60. Roosevelt also argues that the phase-in provision violates Article VIII, Section 7 of the Montana Constitution, which guarantees a property owner the right to appeal appraisals and assessments, because a property owner cannot, under § 15-7-111(1), MCA, receive a reduction on appeal to the true market value of his or her property. Given that Roosevelt, in fact, exercised his administrative appeals and received a 2% downward adjustment to the 1997 value of his property, this contention is difficult to understand. First, he appears to contend that his right to an effective appeal has been diminished because he did not prevail on his current market value argument. However, this argument assumes that current market value is the sole standard by which to measure the constitutionality of a tax. As I have stated above, I disagree with the underlying assumption in this line of argument. Secondly, he seems to argue that unless an appeal achieves a desired result, the right of effective appeal has been denied. There is no merit to this contention. As this Court's opinion herein illustrates, Roosevelt's rights to appeal have been honored from the administrative level all the way through the Montana Supreme Court.

¶61. For the above reasons, I would reverse the decision of the District Court.


/S/ W. WILLIAM LEAPHART


Chief Justice J. A. Turnage joins in the foregoing dissent of Justice W. William Leaphart.

/S/ J. A. TURNAGE

Justice James C. Nelson dissents.

¶62. Although I agree with the majority that § 15-7-111(1), MCA (1997), is unconstitutional on equal protection grounds, I disagree with the majority's conclusion that § 15-7-111(1), is only unconstitutional as it applies to Roosevelt and similarly situated Class Four property owners. I also disagree with the majority's decision to rewrite the statute so that Roosevelt and other similarly situated Class Four property owners are taxed at the actual 1997 market value of their property for the purpose of calculating their 1997 property taxes. In so holding, the majority has misconstrued equal protection clause jurisprudence and has placed itself into the role of the Montana Legislature. I would hold that § 15-7-111(1), violates Montana's Equal Protection Clause on its face, and I dissent from our failure to do so.

¶63. Article II, Section 4, of the Montana Constitution states that "[n]o person shall be denied the equal protection of the laws." The Equal Protection Clause requires that "all persons be treated alike under like circumstances." *Grooms v. Ponderosa Inn* (1997), 283 Mont. 459, 467, 942 P.2d 699, 703. *See also Nordlinger v. Hahn* (1992), 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (citation omitted) (stating that the federal Equal Protection Clause prohibits the governmental decision makers from "treating differently persons who are in all relevant aspects alike.") The purpose of the Equal Protection Clause is to ensure that individuals are not subject to arbitrary and discriminatory state action. *Zemple v. Uninsured Employers' Fund* (1997), 282 Mont. 424, 428, 938 P.2d 658, 661 (citation omitted).

¶64. This Court has ruled that a tax system which causes certain taxpayers to bear a disproportionate share of Montana's tax burden violates the taxpayers' right to equal protection of the laws guaranteed by Article II, Section 4, of the Montana Constitution. *Montana Dept. of Revenue v. Barron* (1990), 245 Mont. 100, 111, 799 P.2d 533, 540. *See also Department of Revenue v. Sheehy* (1993), 262 Mont. 104, 862 P.2d 1181. *Accord Allegheny Pittsburgh Coal Co. v. County Commission of Webster County* (1989), 488 U.S. 336, 345-46, 109 S.Ct 633, 639, 102 L.Ed.2d 688 (stating that

the federal equal protection clause "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class") (quoting *Hillsborough v. Cromwell* (1946), 326 U.S. 620, 623, 66 S.Ct. 445, 448, 90 L.Ed. 358). The United States Supreme Court has recognized that, in the realm of state property taxation, "the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings." *Allegheny*, 488 U.S. at 346, 109 S.Ct. at 639.

¶65. I agree with the majority that § 15-7-111(1), violates Roosevelt's right to equal protection of the laws. However, for two reasons, I cannot agree with the majority's conclusion that § 15-7-111(1), is only unconstitutional as applied to Roosevelt and other similarly situated Class Four property owners. First, contrary to the majority's statement in ¶ 46, § 15-7-111(1), is not neutral on its face. The majority admits as much in ¶¶ 33-36 wherein it states:

It is as clear to us, as it was to the District Court, that § 15-7-111(1), MCA (1997), *results in three classifications* of Class Four property taxpayers:

1. The first class includes those Class Four property owners whose market value declined from 1996 to 1997 and *who were, therefore, assessed in 1997 based on a value greater that the market value of their property*.

2. The second class includes those Class Four property owners whose market value did not change from 1996 to 1997 and *whose property is, therefore, being assessed based on its actual market value*.

3. The third class includes those Class Four property owners whose property increased in value from 1996 to 1997 and *who were, therefore, assessed in 1997 based on a value less that the fair market value of their property*.

(Emphasis added.) In short, it is as clear to the majority as it was to the District Court that § 15-7-111(1) by its own terms, "results in" [(2)] three classes of Class Four property owners and the taxpayers in two of these classes pay a disproportional share of Montana's tax burden. Since the majority concedes that a statute violates equal protection on its face when, by its own terms, it classifies persons for different treatment, I cannot understand how the majority, after stating that the statute results in three classes of Class Four

property owners and acknowledging that two of these classes pay a disproportional share of the tax burden, reaches its conclusion that § 15-7-111(1), is neutral on its face. Clearly, § 15-7-111(1), by its own terms (and, thus, facially), classifies property owners for disproportional tax treatment. The Court's inquiry should therefore be whether § 15-7-111(1), violates Montana's Equal Protection Clause on its face pursuant to the appropriate level of scrutiny.

¶66. Second, in holding that § 15-7-111(1), violates equal protection as applied to Roosevelt and other similarly situated Class Four property owners, the majority misapplies equal protection jurisprudence. A law violates equal protection "as applied" or "in its application" when "the law either shows no classification on its face or else indicates a classification which seems to be legitimate, but those persons challenging the legislation claim that the governmental officials who administer the law are applying it with different degrees of severity to different groups of persons who are described by some suspect trait." Rotunda, Nowak & Young, Treatise on Constitutional Law: Substance and Procedure, § 18.4 (1986). *See also Cutone v. Anaconda Deer Lodge* (1980), 187 Mont. 515, 524, 610 P.2d 691, 697 (stating that a challenge to a statute as violating equal protection as applied arises in cases in which a statute which is constitutionally valid on its face is administered in an arbitrary and discriminatory fashion)(citing *Yick Wo v. Hopkins* (1886), 118 U.S. 356, 6 S.Ct 1064, 30 L.Ed. 220). In simpler terms, a statute violates equal protection "as applied" or "in its application" when the statute is neutral on its face but is being enforced in a disproportionate, discriminatory, or unfair manner.

¶67. Understandably, and for reasons I will discuss later, Roosevelt does not argue in the instant case that § 15-7-111(1), violates equal protection as applied. This theory in this case finds its genesis solely in the majority's determination to partially save an otherwise facially unconstitutional statute. In fact, no party in this litigation argued nor did the District Court hold that § 15-7-111(1), is unconstitutional as applied.

¶68. Rather, Roosevelt correctly argues that § 15-7-111(1), violates Montana's Equal Protection Clause on its face because the statute, by its own terms, results in three classes of Class Four property taxpayers and imposes disproportional tax burdens on two of the classes. Roosevelt does not argue, nor is there anything in the record that indicates, that the Department of Revenue is enforcing § 15-7-111(1), in a disproportionate or discriminatory manner. To the contrary, Roosevelt contends, and the statute, on its face, shows, that he is deprived of his right to equal protection

of the law because the Department of Revenue *is* enforcing § 15-7-111(1), on all Class Four property owners in a similar manner and as mandated by the statute. The result of enforcing § 15-7-111(1), on all Class Four property owners in a similar manner, however, is that two of the taxpayer classes which the statute creates pay a disproportionate share of the tax burden. This disproportional tax treatment does not result from a discriminatory enforcement policy on the part of the Department of Revenue. Rather, this disproportional tax treatment results because the statute, on its face, mandates an assessment method which causes two of three Class Four property owner classifications to pay a disproportionate share of Montana's tax burden. Thus, in holding that § 15-7-111(1), violates the Equal Protection Clause "as applied" or "in its application," the majority has misconstrued equal protection clause jurisprudence.

¶69. Moreover, I cannot agree that the majority needs "to speculate about the constitutionality of the statute as applied to other classes of taxpayers" to hold that it violates equal protection on its face. As noted above, it is as clear to the majority as it was to the District Court that § 15-7-111(1), results in three classes of Class Four property owners and the taxpayers in two of these classes pay a disproportional share of Montana's tax burden. The issue in the instant case is not whether the majority should try to "anticipate every conceivable fact situation to which the 1997 phase-in provision at issue could be applied and whether that statute is rationally related to the state's objective under those circumstances." Rather, the issue in the instant case is whether, under the appropriate level of scrutiny, § 15-7-111(1), when enforced pursuant to its mandates, violates Montana's Equal Protection Clause because it causes similarly situated taxpayers to pay a disproportional share of the tax burden.

¶70. Furthermore, in rewriting the statute, the majority improperly inserts a severability clause into § 15-7-111(1). This Court has repeatedly held that when an unconstitutional provision of a statute is stricken and rejected, the statute is invalid in its entirety if such provision is "necessary to the integrity of the statute, or was an inducement to its enactment." Thus, when an unconstitutional portion of a statute is eliminated, the remainder of the statute may stand only if it is "complete in itself and capable of being executed in accordance with apparent legislative intent." *Newville v. State Dept. of Family Services* (1994), 267 Mont. 237, 255, 883 P.2d 793, 804 (citing *Montana Auto. Ass'n v. Greely* (1981), 193 Mont. 378, 399, 632 P.2d 300, 311). *See also White v. State* (1988), 233 Mont. 81, 759 P.2d 971 (holding that the Science and

Technology Development Board Seed Capital Bond Act was void in its entirety because it suffered from a constitutional defect in its core provisions).

¶71. By holding that § 15-7-111(1), is unconstitutional only as applied to Roosevelt and similarly situated property owners, the majority has upset whatever balance there was in this statute. The State is still losing revenue from those taxpayers whose property increased in value in 1997, but there is no corresponding gain in revenue from those taxpayers whose property decreased in value in 1997. The majority has effectively destroyed the statutory scheme. By excising that portion of the statute that applies to Roosevelt and similarly situated property owners, the statute is not "complete in itself," nor is it "capable of being executed in accordance with apparent legislative intent." What remains and will be enforced under the majority opinion will not be the same statutory scheme as the Legislature intended in the original enactment.

¶72. The majority appears to be acting under the mistaken impression that the act amending § 15-7-111(1) (Senate Bill 195, Ch. 463, Laws of Montana (1997)), contained a "severability clause" similar to the following:

If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

We noted in *Greely* that the inclusion of a "severability clause" in an act is an indication that the drafters and the voters desired that the judicial policy of severability be applied. *Greely*, 193 Mont. at 399, 632 P.2d at 311.

¶73. However, S.B. 195 did not contain a severability clause. More importantly, the failure to include a severability clause in S.B. 195 was not an oversight on the part of the Legislature. An amendment to S.B. 195 containing a severability clause was proposed early on in the discussions concerning that bill, but that amendment was voted down by members of the Senate Taxation Committee. This Court noted in *Sheehy v. Public Employees Retirement Div.* (1993), 262 Mont. 129, 864 P.2d 762, that absent a severability clause, the presumption "is against the mutilation of a statute, and that the legislature would not have enacted it except in its entirety." *Sheehy*, 262 Mont. at 142, 864 P.2d at 770 (quoting *State v. Holmes* (1935), 100 Mont. 256, 291, 47

P.2d 624, 636). **Nevertheless, this Court has held that even acts containing severability clauses may be voided in toto if they contain constitutional defects in their core provisions.** *White*, **233 Mont. at 93, 759 P.2d at 978.**

**¶74. Section 15-7-111(1), contains just such constitutional defects in its core provisions. Moreover, by refusing to include a severability clause in the act amending § 15-7-111(1), the Legislature's intent is clear--§ 15-7-111(1), would not have been enacted except in its entirety.**

**¶75. The majority asserts that in enacting S.B. 195, the Legislature was concerned about a "windfall in revenue" based on increased property values. However, nowhere in the legislative history of S.B. 195 is there a discussion of a windfall in revenue. In addition, the majority contends that in his January 24, 1997 testimony before the Senate Committee on Taxation on S.B. 195, Mick Robinson, representing the Governor's Office, pointed to a concern that general increases in the value of real property throughout the State of Montana would produce more revenue to the state than was necessary. The majority mischaracterizes Robinson's testimony. Robinson stated:**

In the construction of the budget that was presented to this legislature, this administration chose to address the impact of reappraisal by reducing the statewide mills. This course was chosen for a couple of reasons. First, the variable that is normally available to governments when setting their budgets is the number of mills that are required to adequately fund expenditures. Second, the Montana Tax Policy Task Force, which was appointed jointly by the 1995 Legislature and the Governor, spent almost a year studying this very reappraisal issue and recommended an approach requiring all governments to reduce the number of mills as the appropriate response to reappraisal.

Contrary to the majority's assertion, Robinson was pointing out that the statewide mills would be reduced in response to reappraisal thereby preventing the state from obtaining more revenue than was necessary.

**¶76. Moreover, even if,** *arguendo*, **it was the Legislature's intention to avoid a windfall in revenue, one can hardly envision a more bizarre and circuitous way of solving this problem than the tax scheme set out in S.B. 195. Rather than enacting a statute resulting in three classes of taxpayers, two of which are required,**

unconstitutionally, to pay a disproportionate share of their Class Four property tax burden, it would have been a simple matter just to reduce the tax rate for all taxpayers to bring down anticipated revenue or, if too much revenue was received, refund a portion of it on a pro-rata basis to all property tax payers.

¶77. Indeed, it is ironic that the majority--which gives testament to the "principle of judicial restraint"--takes it upon itself to effectively rewrite § 15-7-111(1), so that Roosevelt and other similarly situated Class Four property owners are assessed at the actual 1997 market value of their property for the purpose of calculating their 1997 property taxes while the other Class Four property owners are assessed based on the scheme enacted by the 1997 Legislature. In rewriting the statute, the majority has amended § 15-7-111(1), so that two of the three classes of Class Four property owners pay tax based on the assessed 1997 market value of their property while the remaining group pays tax on the amount below the assessed 1997 market value of their property. Thus, § 15-7-111(1), as rewritten, is no more constitutional than it was before. Now, one class of Class Four property owners will still pay a disproportionate share of the tax burden, albeit a disproportionally low amount. Since a tax system which causes certain taxpayers to bear a disproportionate share of Montana's tax burden violates the taxpayers' right to equal protection of the laws guaranteed by Montana's Constitution, § 15-7-111(1), as amended by the majority, still violates Montana's Equal Protection Clause because there is not even a rational basis to tax two classes of Class Four property owners at the assessed market value of their property while taxing the remaining class at less than the assessed market value of their property.[3] Since the majority's amendment places Roosevelt in a different class of Class Four property owners, it is apparent that, at the majority's invitation, Roosevelt can now sue as to the constitutionality of § 15-7-111(1), as amended by the majority, as it applies to the remaining two classes of Class Four property owners.

¶78. Furthermore, the majority's rewrite of § 15-7-111(1), fails to solve another sort of unconstitutional classification inherent in the statutory scheme. Besides resulting in three classes of taxpayers with two classes paying a disproportionate share of the tax burden, the statute, originally, and as now rewritten, still decrees that there will be one class of taxpayers who must pay the full amount of their tax burden immediately (i.e., those whose property neither depreciated nor appreciated in value and those, now, whose property depreciated in value) and a second class of taxpayers who will not bear the full burden of their property taxes for 50 years (i.e., those whose property appreciated in value). This, obviously, is one of the reasons Roosevelt

**did not argue that the statute was unconstitutional as applied. The majority's rewrite gives him only half a loaf--he now gets to pay his entire property tax on the depreciated value of his property while his neighbors whose property value appreciated do not have to pay their entire property tax burden for 50 years. The majority has simply substituted one form of unconstitutional statute for another.**

**¶79. In sum, I agree with the majority that § 15-7-111(1), is not rationally related to a legitimate state interest and therefore that it is unnecessary to address Roosevelt's argument that we should apply middle-tier scrutiny. It is, however, the function of the Legislature, not this Court, to write the tax laws for this State. If the Legislature cannot get it right--and it did not in its enactment of S.B. 195--it is not the function of this Court to act as a super-legislature to rewrite the tax laws to achieve what may be perceived as a more politically acceptable result. *See Cutone*, 187 Mont. at 524, 610 P.2d at 697. In its determination to take upon itself the function of the Legislature in rewriting § 15-7-111(1), the majority has violated the very principles of judicial restraint that it pans in its opinion; it has ignored the Legislature's obvious intent to enact S.B. 195 as a package (albeit an unconstitutional one) without the possibility of severing parts of the package; it has read into the statute a severability clause in violation of § 1-2-101, MCA[4]; it has misapplied equal protection jurisprudence; and it has substituted one form of unconstitutional statute for another, thus inviting still more litigation.**

**¶80. In his January 13, 1999 State of the State Address, Governor Racicot, referring to this State's "antiquated tax system" observed that**

our state's tax system is unfair.

It must be changed.

Our homeowners . . . and landowners must be freed from the unfair burdens that have, over the years, been heaped on their financial shoulders.

It is truly unfortunate that this Court in its determination to partially save a facially unconstitutional property tax scheme has only exacerbated and prolonged the unfairness which the Governor correctly observes. Moreover, it is unfortunate that this Court, rather than the Legislature, decided that it was the governmental entity responsible for making

the changes to Montana's property tax system.

**¶81. I would hold that § 15-7-111(1), violates Roosevelt's right to equal protection of the laws under Montana's Constitution on its face. I cannot agree with the majority's decision to limit the Court's holding to Roosevelt and other similarly situated Class Four property owners. Accordingly, I would affirm the District Court's judgment.**

**¶82. I dissent.**

/S/ JAMES C. NELSON

1. [1]For example, the following testimony was offered to the Senate Committee on Taxation on behalf of the Governor's Office:

The governor indicated that "Clearly, the property tax situation has urgently seized our immediate attention and will not escape remediation." He went on to indicate that "We will come to grips with the projected and unacceptable property tax increases."

Those statements, as well as the targeting for tax relief of the $85 million of increased property taxes flowing to the state as a result of the 1997 reappraisal, demonstrate the governor's continued commitment toward fairness and equity in Montana's property tax system.

*See* Hearing on S.B. 195 before the Senate Committee on Taxation (Jan. 24, 1997) (testimony of Mick Robinson, Office of the Governor).

2. [2] The majority uses the phrase "results in" in an apparent attempt to buttress its conclusion that §15-7-111(1), is not facially unconstitutional. I make two observations in this regard. First, neither the District Court nor Roosevelt used this terminology. However, as the majority notes, the trial court had no problem in discerning the classifying effects

of the statue from its plain language. Second, the meaning
of "results in" belies the majority's attempt to read facial
unconstitutionality out of the statute by use of this
phrase. "Result in" means "to be the cause of: bring, bring
about, bring on, cause, effect, effectuate, generate,
induce, ingenerate, lead to, make, occasion, secure, set
off, stir (up), touch off, trigger, bring to pass, or give
rise to." *Rogets II, The New Thesaurus*, 834 (3d ed. 1995).
The majority's use of this phrase results in only semantical
distinctions which are without substantive difference. The
plain language of the statute facially creates or "results
in" three classes of taxpayers.

3. [3] The Department of Revenue could argue that there is a rational basis for taxing taxpayers whose property increased in value from 1996 to 1997 based on a value less than the assessed 1997 market value of their property by analogizing to the rational basis grounds set out in *Nordlinger*. However, as the majority correctly points out, Montana does not have an "acquisition value" system of taxation which was at issue in *Nordlinger*. Thus, *Nordlinger* is not controlling. Moreover, a tax system which undervalues property in the same class as that class is defined by state law violates an individual's right to equal protection of the law. *Nordlinger*, 505 U.S. at 32, 112 S.Ct. at 2343 (Stevens, J., dissenting) (citing *Allegheny*, 488 U.S. at 345, 109 S.Ct. at 639). Furthermore, equal protection clause jurisprudence mandates that courts look to whether the legislative enactment is rationally related to a legitimate government interest rather than whether a judicial amendment to a statute is rationally related to a legitimate government interest.

4. [4] Section 1-2-101, MCA, provides:

In the construction of a statute, the office of the judge is simply to ascertain and declare what is in term or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.